# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 99-3040

_____

United States of America,       *
                      *
        Appellee,       *
                      *     Appeal from the United States
    v.               *     District Court for the
                      *     Eastern District of Missouri.
Donald H. Jones,         *
                      *       [PUBLISHED]
        Appellant.       *


_____

Submitted:  May 16, 2001
Filed:  October 15, 2001

_____

Before WOLLMAN, Chief Judge, HANSEN, Circuit Judge, and BARNES,[1] District Judge.

_____

HANSEN, Circuit Judge.

A grand jury indicted the defendant, Donald H. Jones, on two counts of transporting child pornography in interstate commerce, one count of possessing child pornography, and one count seeking forfeiture of the child pornography contraband involved in and the instrumentalities used to commit the charged crimes. Jones moved to suppress evidence obtained by the government, asserting that the evidence

_____

[1] The Honorable Harry F. Barnes, United States District Judge for the Western District of Arkansas, sitting by designation.

was the product of a traffic stop conducted in violation of the Fourth Amendment. The district court, adopting the recommendation of the magistrate judge, concluded that the traffic stop was lawful and that the evidence should not be suppressed. Jones entered into a conditional plea agreement whereby he pleaded guilty to interstate transportation of child pornography in violation of 18 U.S.C. § 2252(a)(1) and to the forfeiture allegations, but reserved the right to appeal the district court's order denying his motion to suppress. We reverse the judgment of the district court and conclude that Jones's Fourth Amendment rights were violated by an unlawful detention, and that the evidence obtained during and as a result of that detention should have been suppressed.[2]

I.

On December 11, 1998, at approximately 5:45 p.m., Trooper DeWitt of the Missouri Highway Patrol observed a black Ford truck with California license plates, driven by Jones, towing a large 29-foot camper northbound on Interstate 270. The truck was traveling at approximately 50 miles per hour, and when Trooper DeWitt began to pass the truck he noticed that the driver slowed down even though the truck was already traveling under the speed limit. Suspicious, DeWitt pulled in behind the truck/camper and followed it for approximately three miles. During this time, the truck slowed to 38 miles per hour in a minimum speed zone of 40 miles per hour. Upon seeing the camper shake and its wheels cross the dividing lines of the traffic lanes both to its left and right, DeWitt became concerned that the driver might be tired or intoxicated. DeWitt activated his emergency lights and stopped the vehicle. After the vehicles were stopped on the side of the Interstate, DeWitt exited his vehicle and approached the passenger side of Jones's truck. Trooper DeWitt explained to

---

[2] Jones was sentenced to a term of 24 months in prison and a 3 year term of supervised release. We were informed at oral argument that the defendant has served the confinement portion of his sentence and is presently on supervised release.

Jones why he had stopped him and requested that Jones exit his vehicle and accompany DeWitt back to the patrol car. Jones complied. While in the patrol car DeWitt asked to see Jones's driver's license and insurance card. DeWitt used his computer to determine if the license and registration were valid and to investigate Jones's criminal history. The results from the license and registration check returned first, and DeWitt determined that both the license and registration were valid.

While waiting for the results of the criminal history search, and while still in the patrol car, DeWitt questioned Jones about the nature and purpose of his trip. At the suppression hearing, Trooper DeWitt testified that Jones appeared nervous while inside the patrol car. Specifically, he testified that Jones's voice cracked, Jones yawned, Jones's thumb shook, and Jones would not make eye contact with him. Despite this apparent nervousness, Jones responded to DeWitt's questions, explaining that he was traveling across the country from California to New Jersey to see his family for the holidays. Jones also explained that he had no permanent address and that the camper was his home. During this questioning, DeWitt asked Jones whether he had any prior arrests and Jones responded that he did not. Subsequently, the results from the criminal history check were transmitted to the patrol car. They indicated that Jones had a prior felony arrest. By this time a second officer had arrived at the scene, and DeWitt used this officer's cellular phone to call his dispatcher and inquire further into Jones's prior arrest. DeWitt learned that Jones had two prior theft arrests. DeWitt asked Jones about these arrests, and Jones initially denied that he had prior arrests. After several more minutes of questioning, however, Jones admitted that he might have been arrested for stealing cigarettes when he was a minor. DeWitt believed that Jones was being evasive because the criminal history information from the dispatcher did not comport with Jones's account. The information from the dispatcher revealed that Jones's prior arrests had occurred within the last four to five years, and Jones's driver's license indicated he was thirty years old.

3

Although suspicious that Jones might be operating under the influence, DeWitt smelled no traces of alcohol on Jones's breath nor did he perceive any other signs that Jones was intoxicated or otherwise impaired. DeWitt gave Jones a warning and returned Jones's license and insurance card. Upon receipt of his documents, Jones exited the vehicle. DeWitt then followed Jones out of the vehicle and began to ask him more questions. DeWitt asked Jones if there was any contraband, including narcotics, aboard the camper. Jones answered, "no, and no." He also replied that he had owned a business in California and had fired two employees for using drugs. DeWitt then asked Jones for permission to search the vehicle, but Jones denied permission, stating that he had always been told "not to let the police into your home." In response, DeWitt told Jones that he was going to call in a canine narcotics unit to inspect the camper. Jones responded, "fine." In Jones's presence, DeWitt radioed for the assistance of a canine unit, but was told there was none in the immediate area. DeWitt directed that a canine unit be sent out to the Interstate location anyway. Officer Swartz and a drug-detecting dog arrived at the scene at approximately 7:05 p.m.--almost one hour after DeWitt called for the canine unit, and almost an hour and one-half after the initial stop. At no point did DeWitt tell Jones he was free to leave.

Officer Swartz and the drug dog conducted an examination of the exterior of the vehicle. The dog alerted to the left rear wheel of the camper. Not finding any narcotics attached to the exterior or underside of the camper, the officers directed Jones to unlock the camper door so that they could search the alerted area from the inside. Jones unlocked the camper door and turned on the lights. The interior of the camper contained furniture, including plants, cabinets, a desk, video equipment, and a computer. The officers conducted a search of the interior of the vehicle while it was still on the Interstate. Officer Swartz removed tape securing the cabinet drawers, opened them, and removed papers and pictures from the drawers to see if narcotics were hidden in the back of the drawers. Officer DeWitt observed photographs of a nude boy on the top of the stack of papers removed from the cabinet drawers. The

4

officers did not search the area the dog had alerted to because the camper was not fully extended and the officers were unable to access it. DeWitt and Swartz determined that the camper needed to be extended to allow them access to the alerted area.

At the officers' direction, Jones drove the truck/camper to an empty fuel shed approximately one-half mile up the Interstate, and the officers followed. Jones extended the camper, allowing the officers to gain access to all parts of the camper. The officers, accompanied by the drug dog, entered the interior of the camper. The dog alerted to the left rear corner of the camper. The officers then searched that area and other parts of the camper, but they did not find any narcotics. DeWitt did find, however, video cassettes with homemade sleeves depicting nude pictures of young boys. Upon seeing the pictures, DeWitt placed Jones under arrest.

## II.

The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. It is well established that a roadside traffic stop is a "seizure" within the meaning of the Fourth Amendment. Delaware v. Prouse, 440 U.S. 648, 653 (1979). For purposes of constitutional analysis, a traffic stop is characterized as an investigative detention, rather than a custodial arrest. Berkemer v. McCarty, 468 U.S. 420, 439 (1984). As such, a traffic stop is governed by the principles of Terry v. Ohio, 392 U.S. 1 (1968). Generally such a stop must be supported by at least a reasonable, articulable suspicion that criminal activity is afoot. Prouse, 440 U.S. at 663. Jones does not challenge the legality of the initial stop of his automobile, and so we need not determine its legality as a traffic stop.

The principles of Terry provide that once Trooper DeWitt lawfully stopped Jones he was entitled to conduct an investigation "reasonably related in scope to the

5

circumstances which justified the interference in the first place." Terry, 392 U.S. at 20; see also United States v. Cummins, 920 F.2d 498, 502 (8th Cir. 1990), cert. denied, 502 U.S. 962 (1991). The scope of a Fourth Amendment intrusion "will vary to some extent with the particular facts and circumstances of each case." Florida v. Royer, 460 U.S. 491, 500 (1983); see also United States v. Willis, 967 F.2d 1220, 1224 (8th Cir. 1992). "The scope of the detention must be carefully tailored to its underlying justification." Royer, 460 U.S. at 500. This means that the Fourth Amendment intrusion "must be temporary and last no longer than is necessary to effectuate the purpose of the stop" and that the officer should employ the least intrusive means available to dispel the officer's suspicion in a timely fashion. Id. Consistent with these principles, our case law teaches us that a police officer, incident to investigating a lawful traffic stop, may request the driver's license and registration, request that the driver step out of the vehicle, request that the driver wait in the patrol car, conduct computer inquiries to determine the validity of the license and registration, conduct computer searches to investigate the driver's criminal history and to determine if the driver has outstanding warrants, and make inquiries as to the motorist's destination and purpose. See, e.g., United States v. Beck, 140 F.3d 1129, 1134 (8th Cir. 1998) (concluding that checking validity of license and administering criminal history check on computer was not unreasonable procedure in traffic stop); United States v. White, 81 F.3d 775, 778 (8th Cir.) (stating officer may ask for license and registration, request driver to sit in patrol car, inquire into destination and purpose, determine if car is stolen, and check for outstanding warrants), cert. denied, 519 U.S. 1011 (1996). The officer may detain the driver as long as reasonably necessary to conduct these activities and to issue a warning or citation. See United States v. Wood, 106 F.3d 942, 945 (10th Cir. 1997). After Trooper DeWitt had completed this initial investigation and determined that Jones was neither tired nor intoxicated, that his license and registration were valid, and that there were no outstanding warrants for his arrest, then the legitimate investigative purposes of the traffic stop were completed. See, e.g., White, 81 F.3d at 778 (stating that upon return of documentation and explanation of warning citation the traffic stop ends); United

6

States v. Bloomfield, 40 F.3d 910, 916 (8th Cir. 1994) (stating that reasonable scope of the initial traffic stop extends to the moment after the return of documents when officer asked if he could search the vehicle), cert. denied, 514 U.S. 1113 (1995).  At this point, with the purpose of the traffic stop completed, it would be an unreasonable extension of the scope of the investigation for Trooper DeWitt to further detain Jones or his vehicle, "unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify a further detention." United States v. Mesa, 62 F.3d 159, 162 (6th Cir. 1995).  Thus, the lawfulness of the continued encounter between DeWitt and Jones after DeWitt had returned Jones's license and registration hinges on two determinations: whether Jones was "seized" within the meaning of the Fourth Amendment, and if so, whether the seizure was founded on a reasonable suspicion that criminal activity was afoot.

Not all personal encounters between law enforcement officials and citizens fall within the ambit of the Fourth Amendment. Terry, 392 U.S. at 19 n.16.  A consensual encounter between an officer and a private citizen does not implicate the Fourth Amendment. Florida v. Rodriguez, 469 U.S. 1, 5-6 (1984).  Even if Trooper DeWitt had no suspicion that Jones was engaged in criminal activity, if the encounter after the completion of the traffic stop was consensual, then the Fourth Amendment would not prohibit Trooper DeWitt from asking questions unrelated to the traffic stop, from seeking consent to search the truck, or even from asking if Jones would wait for the canine unit to arrive.  The determination of which police-citizen contacts fall within the regulation of the Fourth Amendment and which do not is a fact intensive one which turns upon the unique facts of each case. Beck, 140 F.3d at 1135; United States v. Hathcock, 103 F.3d 715, 718 (8th Cir.), cert. denied, 521 U.S. 1127 (1997).  A Fourth Amendment "seizure" does not occur merely because a police officer requests permission to search an area or poses other questions to a citizen. White, 81 F.3d at 779.  Rather, "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." United States

v. Mendenhall, 446 U.S. 544, 554 (1980). When the officer's conduct or "questioning is so intimidating, threatening, or coercive" that a reasonable person would not feel free to leave, then that person has been "seized." Hathcock, 103 F.3d at 718 (internal quotations omitted). "Circumstances that might indicate when an encounter becomes a seizure include the threatening presence of several officers . . . or the use of language or tone of voice [which] indicat[es] that compliance with the officer's request [will] be compelled." Id. at 718-19 (internal quotations omitted).

This encounter bears few of the hallmarks of consensual encounters, cf. United States v. Garfio-Chavez, No. 98-1709, 1998 WL 416815, at *3 (8th Cir. July 22, 1998) (unpublished opinion) (officer told defendant he was free to leave and officer did not follow defendant out of patrol car), and instead appears to us to be a situation where a motorist submitted to a show of authority by an officer who made it evident from his use of language and conduct that the motorist would not be free to leave without first complying with the officer's demands.[3]  In Beck we held that an encounter between an officer and a motorist was a seizure and not a consensual encounter when the officer told the  motorist that he was calling for the assistance of a canine unit, the motorist was present when the officer radioed for the canine unit, and the officer then told the motorist that he was going to have a canine unit inspect his vehicle.  See Beck, 140 F.3d at 1135-36.  This case presents an even stronger case for finding a "seizure" than in Beck.  In this case, Trooper DeWitt never told Jones that he was free to leave.  Cf. id. at 1135 (concluding that officer statement "you are free to leave" indicated consensual encounter).  Trooper DeWitt exited his patrol car and engaged Jones outside the vehicle.  Cf. Garfio-Sanchez, 1998 WL 416815, at *3 (concluding that fact that officer remained seated in patrol car while speaking to motorist standing outside car militated in favor of finding consensual encounter). Trooper DeWitt asked Jones if he could search Jones's camper, and Jones

---

[3] See 8th Cir. R. 28A(i).  In our judgment, this case, although unpublished, has persuasive value under our Rule and so we choose to cite it.

8

told him "no," indicating that Jones did not want to cooperate. Trooper DeWitt chose to ignore this response, instead telling Jones that he was going to call in a canine narcotics unit to examine Jones's vehicle. Jones was present when DeWitt radioed for assistance, and DeWitt told Jones that the drug dog would inspect his vehicle. DeWitt's use of declarative language and his nonresponsiveness to Jones's desire to not have his camper/home inspected would lead a reasonable person to conclude that this encounter was not consensual, and that compliance with the officer's wishes would be compelled. See Beck, 140 F.3d at 1135-36 (holding that consensual encounter ended when officer told defendant that if he did not consent to search then the officer would call for a canine unit); United States v. Finke, 85 F.3d 1275, 1281 (7th Cir. 1996) ("We do not believe a person . . . who had just been told that a canine unit was being called, would feel free to get behind the wheel and drive away from the scene."). Thus, Jones's terse response, "fine," made with the knowledge that a third officer and a narcotics detecting dog would arrive shortly can hardly be considered consensual. In these circumstances, we conclude that Jones was "seized" within the meaning of the Fourth Amendment and that the encounter between the officers and Jones after the completion of the traffic stop was an investigative detention beyond the scope of the original traffic stop.

Generally, an investigative detention must remain within the scope of the traffic stop to be reasonable. United States v. Barahona, 990 F.2d 412, 416 (8th Cir. 1996), cert. denied, 519 U.S. 1140 (1997). "However, if the response of the detainee and the circumstances give rise to suspicions unrelated to the traffic offense, an officer may broaden his inquiry and satisfy those suspicions." Id. Only when an officer develops a reasonable, articulable suspicion that criminal activity is afoot does he have "'justification for a greater intrusion unrelated to the traffic offense.'" Bloomfield, 40 F.3d at 918 (quoting Cummins, 920 F.2d at 502). This requires that the officer's suspicion be based upon "'particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant[] suspicion that a crime [is] being committed.'" Beck, 140 F.3d at 1136 (quoting United States v.

Martin, 706 F.2d 263, 265 (8th Cir. 1983)). In evaluating whether a set of facts would give rise to reasonable suspicion, this court must look at the totality of the circumstances and not just each independent fact standing alone. See United States v. Cortez, 449 U.S. 411, 417 (1981). Furthermore, the court may consider any added meaning that certain conduct might suggest to experienced officers in the field, trained in the observation of criminal activity. Beck, 140 F.3d at 1136. The officer's reasonable suspicion cannot be, however, just a mere hunch or based on circumstances which "describe a very large category of presumably innocent travelers." Reid v. Georgia, 448 U.S. 438, 441 (1980).

The government argues that DeWitt had reasonable suspicion that Jones was engaged in narcotics trafficking based upon a confluence of, what appear to us to be, largely innocent circumstances. Chiefly, the government relies on the facts that Jones slowed while being passed, his camper wheels crossed traffic lines, he gave an inconsistent answer regarding his prior arrest record, and he acted nervously upon being detained and questioned inside Trooper DeWitt's patrol car. We review the district court's findings of historical fact for clear error. Beck, 140 F.3d at 1133. The ultimate determination of reasonableness under the Fourth Amendment is a question of law which we review *de novo*. Id.

DeWitt was passing Jones in the left lane when he saw the truck's brake lights illuminate. DeWitt thought this was suspicious and slowed down and pulled in behind the camper. There is generally "nothing suspicious about a driver . . . slowing down when he realizes a vehicle is approaching from the rear." United States v. Chavez-Villarreal, 3 F.3d 124, 127 (5th Cir. 1993). This "is a normal reaction if the driver wishes to let the tailing vehicle pass." Id. This is particularly unsuspicious in this case where the driver of the larger vehicle, who by all accounts appeared to be having some difficulty keeping his camper confined within its lane, might have decelerated simply to allow the smaller vehicle to pass more quickly and minimize the risk of an accident. After pulling in behind the camper, DeWitt trailed Jones for

10

almost three miles where he observed Jones travel at a slow rate of speed and saw the camper swerve outside of its traffic lane. We attach little suspicion of criminal activity, as opposed to traffic law violations, to these observations for two reasons. First, "when the officer's actions are such that any driver, whether innocent or guilty, would be preoccupied with his presence, then any inference that might be drawn from the driver's behavior is destroyed." United States v. Jones, 149 F.3d 364, 370 (5th Cir. 1998). Second, driving a 29-foot camper in a slow cautious manner on a dark, cold, and windy winter night would not suggest any criminal activity was afoot except, perhaps, driving while intoxicated. Furthermore, the camper's California license plates might suggest that the driver was unfamiliar with Missouri roads and weather conditions and was merely exercising sound judgment in proceeding cautiously. Any suspicions that Trooper DeWitt harbored that Jones was tired or intoxicated were dispelled when Trooper DeWitt questioned Jones in his patrol car. As such, because the Trooper dispelled any suspicion that could reasonably have been inferred from Jones's slow and cautious driving, we conclude that this behavior has nil or de minimis value in our reasonable suspicion calculus as to whether other criminal activity was afoot.

Jones also gave an inconsistent answer in response to DeWitt's questions regarding Jones's criminal history. It is true that if questions reasonably related to a traffic stop create inconsistent answers from the detainee, then the officer's suspicion may be raised so as to enable him to expand the scope of the stop. United States v. Ramos, 42 F.3d 1160, 1163 (8th Cir. 1994), cert. denied, 514 U.S. 1134 (1995). Jones's inconsistent answer regarding his prior theft arrests, however, is not the sort of inconsistency that warrants such a conclusion. Jones's subsequent denial and then later admission that he had been arrested is consistent with innocent behavior. There are numerous reasons why an innocent traveler initially would be reluctant to reveal to law enforcement authorities his criminal history; primarily for fear that it would have the exact effect that it had here, i.e., casting unwarranted suspicion upon that person. Also, an inconsistent answer regarding past conduct is less suspicious than

11

an inconsistent answer regarding present destination or purpose. An inconsistent answer as to the former might cast a shadow of dishonesty upon the character of the motorist, but an inconsistent answer regarding the latter casts suspicion and doubt on the nature and legitimacy of the activity being investigated. See, e.g., United States v. Lebrun, 261 F.3d 731, 734 (8th Cir. 2001) (concluding that inconsistent answers regarding details of trip could support finding of reasonable suspicion); United States v. Foley, 206 F.3d 802, 807 (8th Cir. 2000) (inconsistent answers regarding purpose of trip and accommodations could support finding of reasonable suspicion). More fundamentally, however, we fail to perceive the connection between an inconsistent answer regarding prior minor theft arrests that occurred four to five years ago and suspicion of interstate narcotics trafficking. In the absence of other factors suggesting Jones was engaged in the interstate transportation of narcotics, we conclude that this inconsistent answer could not generate a reasonable suspicion that Jones was involved in interstate narcotics trafficking.

The government also points to displays of nervous behavior as supporting a finding of reasonable suspicion. We have concluded that nervousness combined with several other more revealing facts can generate reasonable suspicion. See, e.g., Foley, 206 F.3d at 804 (finding that the following facts could generate reasonable suspicion: motorist was nervous, motorist was speeding, vehicle was rented, car contained air freshener and masking odor, motorist gave inconsistent answers regarding destination and purpose, motorist failed to remember name of daughter-in-law whom motorist claimed he had just visited). We have also concluded that extreme and unusually nervous behavior observed in conjunction with only one or two other facts can generate reasonable suspicion that criminal activity is afoot. See, e.g., Lebrun, 261 F.3d at 733 (motorist sweating profusely on a cold day). Generally, however, "nervousness is of limited significance in determining reasonable suspicion." United States v. Fernandez, 18 F.3d 874, 879 (10th Cir. 1994). "[W]hile a person's nervous behavior may be relevant, we are wary of the objective suspicion supplied by generic claims that a Defendant was nervous or exhibited nervous behavior after being

12

confronted by law enforcement officials." United States v. Barron-Cabrera, 119 F.3d 1454, 1461 (10th Cir. 1997) (internal quotations omitted). Because the government repeatedly relies on nervousness as a basis for reasonable suspicion, "it must be treated with caution." Fernandez, 18 F.3d at 879.

DeWitt testified that Jones yawned, his voice cracked, his thumb shook, and he failed to make eye contact with DeWitt. Trooper DeWitt testified that this was not abnormal behavior because many motorists become nervous when pulled over and confronted by law enforcement officials. We have determined that "[i]t certainly cannot be deemed unusual for a motorist to exhibit signs of nervousness when confronted by a law enforcement officer." Beck 140 F.3d at 1139. Furthermore, Jones's behavior is rendered less suspect given that any nervous behavior he might have displayed was likely accentuated by the appearance of another officer at the scene. Moreover, Trooper DeWitt had never met Jones, and was unfamiliar with his usual demeanor, and thus DeWitt's evaluation of Jones's behavior lacks any foundation. This is troubling where the alleged signs of nervousness are not the kind of "unusual," "exceptional," or more objective manifestations of nervousness that might, in combination with the limited other facts presented here, support a finding of reasonable suspicion. Everybody yawns. Cf., Lebrun, 261 F.3d at 733 (defendant exhibited exceptionally nervous behavior, including profuse sweating during cold weather). We conclude that any suspicion engendered by this nervous behavior is at best minimal.

Finally, the government argues that although each of these factors when considered alone does not engender a reasonable suspicion that criminal activity is afoot, when considered together they would support a finding of reasonable suspicion. We agree that in some circumstances the sum may amount to more than its parts. The facts presented in this case–minimal nervousness and an inconsistent answer as to prior arrests–whether viewed alone or in combination, amount to little. When an officer can cite only one or two facts, including a generic claim of

nervousness, as supporting his determination of reasonable suspicion, then we may conclude that his suspicion was not reasonable, see Bloomfield, 40 F.3d at 918, n.9, for "'it is impossible for a combination of wholly innocent factors to combine into a suspicious conglomeration unless there are concrete reasons for such an interpretation.'" Beck, 140 F.3d at 1137 (quoting Wood, 106 F.3d at 948). The government has not provided such a reason. Therefore, we conclude that the facts presented here do not generate a suspicion sufficient to warrant Jones's detention.

## III.

Trooper DeWitt's detention of Jones past the point necessary to complete his traffic stop investigation exceeded the scope of a lawfully initiated traffic stop. The extended investigative detention was unsupported by a reasonable, articulable suspicion that criminal activity was afoot and therefore violated Jones's Fourth Amendment right to be free from unreasonable seizure. The evidence obtained in this case is tainted as a result of this unlawful detention and should have been suppressed. See Wong Sun v. United States, 371 U.S. 471, 484-86 (1963); Ramos, 42 F.3d at 1164 (stating that physical evidence obtained as a result of an illegal detention is not admissible). We reverse the district court's judgment, we vacate Jones's conviction and his sentence, and we remand for further proceedings not inconsistent with this opinion.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

14