# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 02-3238

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Plaintiff - Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Northern District of Iowa. |
| Kou Yang, | * | |
| | * | |
| Defendant - Appellee. | * | |

_____

Submitted: May 13, 2003

Filed: September 30, 2003

_____

Before LOKEN, Chief Judge, BRIGHT and MURPHY, Circuit Judges.

_____

LOKEN, Chief Judge.

Iowa State Trooper Mark Anderson stopped a vehicle proceeding north on Interstate 35 for having excessively dark windows. At the conclusion of the traffic stop, driver Kou Yang consented to a search of the vehicle. The search yielded some suspicious items but no contraband. Yang then said he wanted to leave, but Anderson detained the vehicle until a drug dog could arrive. When the dog alerted to the presence of narcotics, Anderson took the vehicle to a nearby truck stop for a more thorough search. The second search yielded no contraband, but Anderson could not find Yang to return the vehicle. The following day, with the vehicle still unclaimed, Anderson obtained a search warrant. The warrant search uncovered one and one-half

pounds of methamphetamine hidden in the vehicle. Yang was indicted for possession with intent to distribute.

Yang moved to suppress the methamphetamine. After a hearing, the magistrate judge recommended suppression because Yang's consent to search was involuntary. The district court disagreed but granted the motion to suppress on another ground -- that Anderson lacked reasonable suspicion to detain the vehicle after Yang revoked his consent. The government appeals. Reviewing the district court's factual findings for clear error and its conclusions of law de novo, we reverse. United States v. Wells, 223 F.3d 835, 838 (8th Cir. 2000) (standard of review).

## I. Background

The traffic stop occurred at 11:33 a.m. on July 17, 2001. While asking Yang for his driver's license, vehicle registration, and proof of insurance, Trooper Anderson saw numerous food items, a cell phone, and an atlas on the passenger seat, and a roll of toilet paper on the floor. Yang volunteered that he had flown to Dallas, Texas, to purchase the vehicle. The certificate of title showed a transfer of title to Yang and a handwritten odometer reading of 187,000 miles. Yang volunteered that he had made some repairs to the vehicle in Texas.

While Anderson completed the traffic stop paperwork, he questioned Yang about his travel to purchase the car. Yang said that after his wife saw the car on the internet, he paid $5,000 for the car, sending a money order for half the purchase price before flying to Dallas. Yang said he had flown to Dallas from Minneapolis on July 11th and left Dallas on the 12th. Anderson commented that five days seemed too long to drive from Dallas to Iowa. When Yang said he was a co-owner of a temporary help agency in Minneapolis, Anderson asked if Yang was in a hurry to get home. Yang said he was but would only drive "200 miles or so [before] I'd stop and rest so I wouldn't get in a car accident."

Anderson issued a warning citation at 11:47 a.m. and told Yang he was free to go. As Yang left the patrol car, Anderson asked, "Would there be any reason why somebody would ah say that you are hauling narcotics today?" Yang calmly said no, denied having any drugs with him, and walked toward his car. As he reached the driver's side door, the following exchange took place:

Anderson: Sir! You're free to go and all but I, would it be alright if I searched your car?

Yang: Yea.

Anderson: . . . I just have a piece of paper I'd like you to sign if you would for me. If that's okay. I'll show it here to ya. It's a consent to search form . . . . giving me permission to search your vehicle if that's alright.

Yang: But I could just leave? Or what?

Anderson: Yes, you can.

Yang: Oh, then I'm just going to go.

\* \* \* \* \*

Anderson: You don't want to sign this?

Yang: I do not.

\* \* \* \* \*

Anderson: Like I said, this is just a consent to search form. It's like what says that I could do it, it's just for my office, for my boss. Um, if that's all right, I'll just have you sign by the star, but you don't have to either if you don't want to.

Yang:        I don't, but I can open the trunk (unintelligible) everything and you can see it.

Anderson:    You just don't want to sign?

Yang:        No.

Anderson:    But it's all right if I search your vehicle though?

Yang:        Yeah.

Yang opened the trunk at 11:49 a.m. At about this time, Iowa State Trooper David Baker arrived. When Anderson finished searching the trunk, he turned to Yang and said, gesturing towards the car's passenger compartment, "All right if I look? That okay?" Yang nodded affirmatively. Anderson began searching the car at 11:52 a.m.

In the car, Anderson found a July 11 receipt from a tire store in El Paso, Texas and a July 12 receipt from an auto glass shop in San Diego, California. Anderson asked Yang if he had been in California; Yang responded he had visited his mother in San Diego. Anderson also found a set of new screwdrivers; Yang explained he bought the screwdrivers to open the car door after he locked his key in the car. Anderson testified that Yang began to appear nervous at this point. At 12:03 p.m., Anderson and Baker summoned a K-9 unit from Iowa Falls. At 12:14, Anderson told Yang his story did not make sense and said that a drug dog would soon arrive. Yang said they had searched long enough and he wanted to go. Anderson said Yang could leave but they would detain the vehicle for a dog sniff. Yang declined a ride to a nearby truck stop and waited with the vehicle. At 12:31 p.m., an Iowa Falls K-9 unit arrived. When the dog alerted on the car a few minutes later, the troopers told Yang they would search the car further and then release it to Yang if nothing was found. At about 1:00 p.m., Yang agreed to drive the car to a safer location, a truck stop seven miles north of the traffic stop.

When they arrived, Yang got out of his car and walked towards the truck stop. The officers resumed their search of the car. They again found no contraband. Anderson went to the truck stop to tell Yang he could leave with the car. Truck stop employees said that Yang had left the truck stop and not returned. Anderson filled out a tow sheet and inventory form and placed a "no hold" on the vehicle, which meant that Yang could reclaim it. After telling the truck stop employees that Yang was free to take the vehicle, Anderson and Baker left the truck stop that evening. The truck stop owner stored Yang's car in a locked metal shed. The following day, Anderson obtained a warrant to search the vehicle and returned to the truck stop to conduct the warrant search. Using the screwdrivers found in the car, Anderson removed a speaker cover and some molding and found the methamphetamine hidden inside the passenger door.

## II. The Magistrate Judge's Decision

After an evidentiary hearing on Yang's motion to suppress, the magistrate judge recommended the motion be granted because (i) at the end of the traffic stop, Trooper Anderson had no "concrete reasons" to suspect Yang of criminal activity and therefore no reasonable suspicion justifying continued detention; (ii) Anderson then illegally detained Yang by asking him for permission to search the car; and (iii) Yang's consent to search did not purge the taint of this unlawful detention because the consent was coerced when Anderson "lied to Yang about the consent form" and twice prevented Yang from leaving by drawing him into further conversation after saying he was free to go. The magistrate judge also observed that, if the consent to the initial search was in fact voluntary, the discovery of "suspicious paperwork from California," after which "Yang changed his story about his itinerary," gave Anderson "ample reason to detain the vehicle until the drug dog arrived." The district court rejected the magistrate judge's analysis, concluding that Yang's consent to the initial search was voluntary and therefore purged the taint of any prior illegal detention. We agree with the district court.

In the first place, the magistrate judge erred in concluding that Trooper Anderson unlawfully detained Yang by asking him for permission to search the car after the traffic stop was over. Law enforcement officers do not violate the Fourth Amendment by asking a person for consent to search or other types of cooperation, even when they have no reason to suspect that person, "provided they do not induce cooperation by coercive means." United States v. Drayton, 536 U.S. 194, 201 (2002); see United States v. Jones, 269 F.3d 919, 925 (8th Cir. 2001). That being so, the time it takes for an officer to find out if consent will be given cannot be an unlawful detention in the absence of coercive or otherwise unusual circumstances. Here, after completing the traffic stop, Anderson told Yang he was free to go and asked for consent to search the car. Yang immediately said, "Yea," and after a few additional moments of conversation opened the trunk of the car for Anderson. There was no unlawful detention.

Second, even if Anderson's request for consent amounted to illegal detention, we agree with the district court that the illegality was purged by Yang's voluntary consent to the search. See United States v. Kreisel, 210 F.3d 868, 869 (8th Cir.), cert. denied, 531 U.S. 916 (2000) (consent purges illegal taint). In response to Anderson's initial request, Yang voluntarily consented to the search. Anderson then used a bit of deception in trying to persuade Yang to sign a consent-to-search form. We do not approve of that tactic, but it did not have a constitutionally coercive effect. Yang persisted in refusing to sign the form but confirmed his oral consent to a search by opening the trunk for Anderson. After the trunk was searched, Yang signaled with a nod that Anderson could search the vehicle's passenger compartment. When oral consent is voluntarily given, the absence of a signed consent form is immaterial. United States v. Martel-Martines, 988 F.2d 855, 859 (8th Cir. 1993). The district court did not err in finding that the consent-to-search was voluntary. See United States v. Moreno, 280 F.3d 898, 900-01 (8th Cir. 2002).

### III. The District Court's Decision

The district court nonetheless granted Yang's motion to suppress, concluding that Troopers Anderson and Baker violated the Fourth Amendment at a later point in the encounter. Forty minutes after the traffic stop, when the troopers advised Yang they had called for a drug dog, he said they had searched long enough and he wanted to leave. The government does not challenge the court's finding that this was a revocation of the prior consent-to-search. Thus, the issue is whether, at that moment, the troopers had reasonable suspicion that other criminal activity may be afoot, justifying their decision to detain the vehicle until the drug dog arrived some fifteen minutes later. The government argues that many circumstances provided reasonable suspicion that Yang's vehicle was transporting illegal drugs. The district court individually analyzed those circumstances and concluded they "appear to be nothing more than a collection of innocent circumstances" that did not provide reasonable suspicion to further detain Yang's vehicle. Like the magistrate judge, we disagree.

The Supreme Court has said repeatedly that courts must look at the totality of the circumstances when deciding whether there was reasonable suspicion supporting an investigatory detention. United States v. Arvizu, 534 U.S. 266, 273 (2002). Thus, even if Yang's individual actions might be innocently explained, his behavior "must be considered as a whole and in the light of the officers' 'experience and specialized training.'" United States v. Ameling, 328 F.3d 443, 448 (8th Cir. 2003) (quoting Arvizu, 534 U.S. at 273). In Arvizu, the Court reversed a suppression order, criticizing the court of appeals for evaluating seven factors "in isolation from each other" and giving them "no weight" because each "was by itself readily susceptible to an innocent explanation." 534 U.S. at 274. Similarly, the district court erred by analyzing the circumstances in isolation, concluding that flying from Minneapolis to Texas to purchase a high-mileage car created "no specific, articulable basis" to suspect drug trafficking; failure to disclose the trip to California "could not generate a reasonable suspicion"; the five days it apparently took to drive from Dallas to Iowa

was innocently explained by Yang's later admission he had also traveled to California; no "reasonable suspicion of criminality" may be gleaned from the fact Yang was traveling from a drug source area; and finding a cell phone and screwdrivers in the car and observing half-eaten food and toilet paper on the floor of the car were "entirely consistent with innocent travel."

An officer making a traffic stop may ask the driver his destination and the purpose for his trip. United States v. Linkous, 285 F.3d 716, 719 (8th Cir. 2002). The answers to these routine questions may arouse suspicion that other criminal activity is afoot, in which case the officer may ask additional questions to verify or dispel his suspicion. United States v. Ramos, 42 F.3d 1160, 1163 (8th Cir. 1994), cert. denied, 514 U.S. 1134 (1995). The officer may ask for consent to search and if consent is given, act on whatever information he acquires. United States v. Martinez, 168 F.3d 1043, 1047 (8th Cir. 1999). "An officer's suspicion of criminal activity may reasonably grow over the course of a traffic stop as the circumstances unfold and more suspicious facts are uncovered." Linkous, 285 F.3d at 720.

In this case, Anderson testified that his suspicion was initially aroused because Yang was coming from a drug source state; had flown to Texas to purchase a high-mileage car and to drive it back to Minneapolis; said he was in a hurry to get home but was driving well under the speed limit and had taken five or six days to travel from Dallas to Iowa; was traveling with a cell phone and with items indicating he did not want to stop; and gave uncommon answers to questions about crime and narcotics. During the initial consensual search, Anderson's suspicion was heightened when he found a new set of screwdrivers and receipts revealing tire repair in El Paso and glass repair in San Diego, California. When questioned about these items and his trip to California, Yang for the first time became agitated and "he started to pace back and forth," paying much closer attention to Anderson and the car. Shortly thereafter, Anderson told Yang that a drug dog had been summoned. Yang immediately said they had searched long enough and he wanted to leave. See United States v. Green,

52 F.3d 194, 199-200 (8th Cir. 1995) (revocation of consent may contribute to reasonable suspicion). In these circumstances, we conclude the troopers had reasonable suspicion that the car might be transporting illegal drugs, which warranted a brief detention until the drug dog arrived and sniffed the vehicle. See United States v. Bloomfield, 40 F.3d 910, 917 (8th Cir. 1994) (en banc) (one-hour detention was lawful), cert. denied, 514 U.S. 1013 (1995); United States v. White, 42 F.3d 457, 460 (8th Cir. 1994) (eighty-minute wait for a drug dog was reasonable).

When the dog alerted on Yang's vehicle, the troopers had probable cause to search the vehicle without a warrant. United States v. $404,905.00 in U.S. Currency, 182 F.3d 643, 647 (8th Cir. 1999), cert. denied, 525 U.S. 1161 (2000). Accordingly, there was no Fourth Amendment violation prior to Trooper Anderson obtaining the warrant, and we need not consider the government's alternative argument that Yang abandoned the vehicle at the truck stop before the warrant was obtained.

The district court's order granting Kou Yang's motion to suppress is reversed.

BRIGHT, Circuit Judge, dissenting.

I respectfully dissent. This case centers on a fact-intensive inquiry where police officers searched Kou Yang's car on three separate occasions.[1] I agree with the majority that we must focus on whether, at the time the trooper decided to further

---

[1]Yang consented to the first search where Trooper Anderson searched the trunk and passenger compartment of Yang's vehicle on the roadside. In the second search, law enforcement searched Yang's vehicle at a nearby truck stop. The third search, based on a search warrant, occurred the following day. In addition, a drug dog sniffed both the exterior and interior of Yang's car while stopped on the interstate. A canine sniff of Yang's car, while on the highway, does not constitute a search for Fourth Amendment purposes. United States v. $404,905.00, 182 F.3d 643, 647 (8th Cir. 1999) (citing United States v. Place, 462 U.S. 696, 707 (1983)).

detain Yang's car to await the arrival of the canine unit, the trooper had a reasonable suspicion that Yang may be engaged in criminal activity other than the basis for the stop.

I begin with the factual background prior to the decision to bring in the canine unit. Trooper Anderson decided to stop Yang's car based on a window tint violation. Before deciding to search Yang's car, Trooper Anderson explained that fifteen reasons supported his suspicion that Yang was engaged in criminal activity: (1) Trooper Anderson was unfamiliar with anyone flying to pick up a car bought over the internet; (2) Yang indicated he began his travels in Texas, a drug source state; (3) Yang indicated he was in a hurry to get home, but was driving in short 200-mile intervals; (4) Yang was uncertain of the exact date he began his travel; (5) Trooper Anderson observed food and toilet paper in Yang's car; (6) Yang had a cell phone and an atlas in the front seat of the car; (7) Yang paid half of the car's purchase price prior to seeing the car; (8) the car's license plates were not registered to Yang; (9) Yang drove below the speed limit; (10) the mileage on the car's title did not reflect the miles on the car at the time the trooper stopped it; (11) Yang had paid for repairs to the car after purchasing it; (12) "Yang gave an uncommon answer when the trooper asked about crime in [Yang's] neighborhood"; (13) Yang initially answered the trooper's question regarding drugs in a calm manner; (14) Yang gave a general response about where he had the car fixed; and (15) "Yang was driving a newly-purchased vehicle, and only had one key on the key ring."

After Trooper Anderson issued Yang a ticket for the tinted windows, Yang consented to a search of his car. Trooper Anderson did not find any incriminating evidence in the car's trunk. In a side pocket on the driver's side door, Trooper Anderson located a yellow receipt from an auto glass shop in San Diego, California. Previously, Yang indicated to the trooper that he had the windshield replaced on the car. Trooper Anderson also discovered a white receipt from a Firestone store in El

Paso, Texas. Prior to the discovery of the receipt, Yang told the trooper he had either the back tire or rim on the car fixed in Texas.

In answering a question from the trooper, Yang indicated that he had been in California visiting his mother, and that he did not tell the trooper every step of his trip. At this point, Trooper Anderson testified to noticing a change in Yang's demeanor, including a change in body language, tone of voice, and that Yang appeared to become more agitated. Trooper Anderson's further search of the car uncovered a set of new screwdrivers. Yang explained he purchased the screwdrivers after he locked the keys in the car.

As the majority explained, whether Trooper Anderson had reasonable suspicion to detain Yang's car for a canine sniff must exist based on the facts up to this point. Based on the facts to this point, the district judge did not err in finding that Trooper Anderson lacked reasonable suspicion to further detain Yang's car.

This court reviews district court's findings of historical fact for clear error and determination of reasonable suspicion and probable cause *de novo*. United States v. Beck, 140 F.3d 1129, 1133 (8th Cir. 1998). In determining, whether a law enforcement officer has reasonable suspicion to search, courts focus on "the totality of the circumstances, in light of the officer's experience." United States v. Bloomfield, 40 F.3d 910, 918 (8th Cir. 1994). Courts give deference to the experience and expertise of law enforcement officers in determining whether certain conduct is suspicious.[2] However, the Supreme Court pointed out that our review

_____

[2]The Supreme Court explained "a police officer may draw inferences based on his own experience in deciding whether probable cause exists. To a layman the sort of loose panel below the back seat armrest in the automobile . . . may suggest only wear and tear, but to Officer Luedke, who had searched roughly 2,000 cars for narcotics, it suggested that drugs may be secreted inside the panel." Ornelas v. United States, 517 U.S. 690, 700 (1996). Many of the factors Trooper Anderson

must give "due weight to inferences drawn from those facts by resident judges and local law enforcement officers." Ornelas v. United States, 517 U.S. 690, 699 (1996). The Supreme Court explained:

> A trial judge views the facts of a particular case in light of the distinctive features and events of the community; likewise, a police officer views the facts through the lens of his police experience and expertise. The background facts provide a context for the historical facts, and when seen together yield inferences that deserve deference. . . . The background facts, though rarely the subject of explicit findings, inform the judge's assessment of the historical facts.

Id. at 699-700.

Though each factor giving rise to suspicion might appear to be innocent when viewed alone, a combination of factors may warrant further investigation when viewed together. United States v. Linkous, 285 F.3d 716, 720 (8th Cir. 2002). An officer's suspicion may grow as the circumstances unfold and more suspicious facts are discovered. Id. However, as the district court explained, the reverse is also true. Certain facts that are discovered may also lessen the importance of previously suspicious factors.

> While we are mindful that "conduct which would be wholly innocent to the untrained observer . . . might acquire significance when viewed by an agent who is familiar with the practices of drug [traffickers] and the methods used to avoid detection, . . . it is impossible for a combination of wholly innocent factors to combine into a suspicious conglomeration unless there are concrete reasons for such an interpretation."

relied on were not of the kind noted in Ornelas. Trooper Anderson did not note any particular factors that made him suspect drugs were concealed in the car, such as missing screws, loose panels, or paint oversprays.

United States v. Beck, 140 F.3d 1129, 1137 (8th Cir. 1998) (citations omitted). Further, "[c]onduct typical of a broad category of innocent people provides a weak basis for suspicion." United States v. Weaver, 966 F.2d 391, 394 (8th Cir. 1992).

In Beck, we held that the totality of seven innocent factors did not create reasonable suspicion to warrant Beck's continued detention. 140 F.3d at 1137. In making this determination, we examined each individual factor to discuss its wholly innocent nature. Id. at 1137-39; see also United States v. Yousif, 308 F.3d 820 (8th Cir. 2002) (holding district court erred in denying motion to suppress because innocent factors did not support a finding of reasonable suspicion).

Here, the court undertook a similar analysis to discount Trooper Anderson's factors he stated supported a reasonable suspicion. First, the district court explained that many of the trooper's initial fifteen reasons were wholly innocent, and fit a large number of the general population. "General profiles that fit large numbers of innocent people do not establish reasonable suspicion." United States v. Yousif, 308 F.3d 820, 828 (8th Cir. 2002). The district court noted the possession of a cell phone and an atlas do not establish reasonable suspicion, and Trooper Anderson testified that he possessed both items in his patrol car. The district court also discounted the presence of a screwdriver set in the car as consistent with innocent car ownership.

Further, the court rejected the presence of food and toiletry items in the car because Trooper Anderson "provided no basis for his supposition that the carrying of food stuffs and toiletry items in a car is indicative of drug trafficking activity." At the suppression hearing, the magistrate judge admitted to having similar items in his car. This Circuit has previously held that the presence of food wrappers in a car is consistent with innocent travel. See United States v. Beck, 140 F.3d 1129, 1138 (8th Cir. 1998). Trooper Anderson offered no basis for his supposition that the presence of common items constitutes an identifier of drug trafficking activity. Similar to the

circumstances in <u>Beck</u>, Trooper Anderson merely recounted that he had seen the presence of similar items during stops of other drug traffickers. <u>Id.</u> at 1139.

In addition, the district court explained that reasonable suspicion could not be established by Yang's driving a car with Texas license plates. <u>Yousif</u>, 308 F.3d at 828 (holding that driving a car with out of state plates on a highway known to be a drug corridor did not support reasonable suspicion to stop the defendant's car); <u>see also</u> <u>United States v. Gray</u>, 213 F.3d 998, 1001 (8th Cir. 2000) ("[t]oo many people fit this description for it to justify a reasonable suspicion of criminal activity"). Out of state plates are consistent with innocent behavior and are not probative of reasonable suspicion. <u>Beck</u>, 140 F.3d at 1137.

Next, the district court discounted factors that became less suspicious after Trooper Anderson searched Yang's car. For example, instead of suspicion being bolstered as more information was revealed, the discovered receipts confirmed that Yang made repairs to the car. Further, Trooper Anderson testified that Yang's story regarding the car's purchase made him suspicious because he "had never ran into anybody who had done that before [purchase a car over the internet], and through my training and experience, criminal--people involved in criminal activity have in the past flown to pick up vehicles from a certain location and drive them back." Trooper Anderson also explained that Yang's driving below the speed limit and taking days to return home, "seemed strange" when Yang said he was in a hurry to return home. Thus, Trooper Anderson's suspicion for these two factors was not based on experience and training, but rather a "hunch." <u>See</u> <u>United States v. Campbell</u>, 843 F.2d 1089, 1093-94 (8th Cir. 1988) ("the officers must be acting on facts directly relating to the suspect or the suspect's conduct and not just on a 'hunch'").

In addition, the district court explained the subsequent search verified Yang's story that he purchased the car from the internet. Trooper Anderson found a copy of the internet posting of the car. Trooper Anderson explained he was suspicious

because the car was not registered to Yang and drug traffickers frequently do not have the car registered in their name to distance themselves from the crime. However, the fact that Yang recently purchased the car would explain why the car was not registered to Yang. Trooper Anderson also noted that the car's title had been signed over to Yang yet did not explain how the failure to register the car but sign the title supported reasonable suspicion.

Next, Trooper Anderson testified the presence of a single key was suspicious because drug traffickers generally try and limit access to the trunk area of the car. The district court discounted Trooper Anderson's contention since the single key became less suspicious when Yang consented to a search of the car's trunk.

Finally, the district court observed that the change from Yang's calm demeanor to a nervous and agitated one after Trooper Anderson told Yang he was calling in the canine unit does not support a finding of reasonable suspicion.[3] United States v. White, 890 F.2d 1413, 1418 (8th Cir. 1989) ("becoming nervous when one is confronted by officers of the law is not an uncommon reaction."). Under similar circumstances, I suspect that many innocent travelers would become frustrated, nervous, and agitated when, after being detained for a lengthy period of time, law enforcement officers stated they wanted to conduct a second search of the car. See Yousif, 308 F.3d at 829 ("Finally, the checkpoint was not where the police signs indicated it would be and, therefore, any motorist would likely be surprised upon

---

[3]The district court also rejected the contention that Yang's initially calm demeanor was suspicious. The court explained "there has been no showing that Trooper Anderson's questioning technique is objectively reasonable. Indeed, the response which Trooper Anderson finds suspicious is the opposite of that normally through [sic] to be suspicious, overly overt nervousness." It is difficult also to perceive that if someone is calm under one situation, his actions are suspicious, but if he acts agitated, suspicion also arises.

discovering it. Under such circumstances, even an innocent traveler might be inclined to hesitate out of surprise, annoyance, or nervousness.").

While Trooper Anderson explained generally that the individual factors, taken together, supported reasonable suspicion, Trooper Anderson did not base some of the factors on his professional experience, rather on his personal opinion. See United States v. Johnson, 171 F.3d 601, 604 (8th Cir. 1999) (holding law enforcement officers must explain their inferences and deductions). For instance, he explained Yang's paying for half of the car, sight unseen, was suspicious because "I just put that in my own personal thoughts. I wouldn't myself pay for any vehicle up front if I hadn't seen it, and it just caught me off guard." In addition, regarding the discrepancy between the mileage on the car and on the title Trooper Anderson commented, "I didn't understand why the mileage would be incorrect when you are supposed to put the mileage down on the title when you transfer the vehicle." Trooper Anderson did not indicate how this factor raised suspicion that Yang might have been engaged in criminal activity.

The additional "suspicious" circumstances noted by Trooper Anderson are questionable also. Those occurred after Yang's initial illegal detention and before the trooper obtained Yang's consent to search. Trooper Anderson would never have obtained this information but for his illegal detention of Yang after issuing the ticket. Courts should be wary of relying on ambiguous conduct that law enforcement officers have provoked. Wong Sun v. United States, 371 U.S. 471, 484 (1963) ("A contrary holding here would mean that a vague suspicion could be transformed into probable cause for arrest by reason of ambiguous conduct which the arresting officers themselves have provoked.").

While courts should give deference to the expertise and specific knowledge that law enforcement officers have to suspect and detect drug activity, the district court properly concluded the totality of the circumstances did not support a

reasonable suspicion for further detention of Yang's car to await the canine unit.[4] The able and experienced district court judge thoroughly examined and analyzed the facts in determining that the trooper violated Yang's Fourth Amendment rights. Here the inferences from the facts can and do support the district judge's decision. No clear error existed, but merely a difference of views between the majority and the district court on inferences to be drawn from the evidence. This difference does not amount to clear error. Thus, I would affirm the district court.

––––––––––––––––––––––––––––––

[4]The court concluded that the sum of "circumstances relied upon by the government when examined in light of Trooper Anderson's training and expertise do not give rise to a reasonable, articulable suspicion that defendant Yang was engaged in criminal activity at the time that he informed defendant Yang that he was not going to permit him to leave with his car."