# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-1842

_____

|  |  |  |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Western District of Missouri. |
| Brady Ray Long, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: March 12, 2008
Filed: July 15, 2008 (corrected 7/23/08)

_____

Before WOLLMAN, HANSEN, and MELLOY, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Brady Ray Long pleaded guilty to possession with intent to distribute methamphetamine and conspiracy to distribute methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 846 and was sentenced to 246 months of imprisonment. He appeals the district court's[1] decision to deny his motion to suppress evidence, as

---

[1]The Honorable Nanette K. Laughrey, United States District Judge for the Western District of Missouri.

recommended by the magistrate judge[2] to whom the matter was referred. He also appeals his sentence, challenging the district court's drug quantity determination.

## I. Background

Long and Peggy Albers were associates in selling methamphetamine. They bought approximately eight to ten ounces of methamphetamine twice a week during July and August of 2004. On September 2, 2004, Long was taken into custody for having violated the terms of his supervised release on an earlier federal narcotics violation conviction. During Long's September-October incarceration, Albers sold approximately 100 ounces of methamphetamine to their customers. Long's supervised release was revoked on October 22, 2004, and he was given a one-week release pending his self-surrender on October 29 to begin his new term of imprisonment.

Long and Albers planned to make a sale to a reseller, Vickie Munroe, the transaction to occur on the night of October 27, 2004. Earlier that day, Long and Albers met at People Brokers, a business that Long co-owned, where they packaged their methamphetamine. When Munroe arrived that night, Long and Albers discovered that they had left the methamphetamine at People Brokers, so Long took Albers's car to recover the drugs.

Lake Ozark police officer Dale Heiser was patrolling at about midnight that night near People Brokers, which law enforcement believed was a frequent site of large methamphetamine sales. Heiser noticed a vehicle headed in the direction of People Brokers, so he pulled over and waited. About five minutes later, Heiser saw the same vehicle returning. Finding this to be suspicious activity in that area at that

---

[2]The Honorable William A. Knox, United States Magistrate Judge for the Western District of Missouri.

time of night, Heiser followed the vehicle, which turned out to be driven by Long, and observed it cross the center yellow line, following which it slowly veered back to the white fog line on the right side of the road, leading Heiser to believe that the driver may have been intoxicated. Shortly thereafter, Long turned on his left blinker at a point at which no exit existed and then turned the blinker off, whereupon Heiser pulled the vehicle over to check on the driver's sobriety. Heiser asked Long if he had been drinking, took Long's license and insurance card, and asked Long to step out of the car for a sobriety test, which Long completed successfully. Long's hands were shaking and he was perspiring, and he appeared to be noticeably more nervous than the normal person that Heiser pulled over. Heiser then asked Long for consent to search the vehicle. Long responded that it was not his vehicle. Heiser informed Long that his control over the vehicle authorized him to consent to a search and again asked for consent, which Long then granted. As a part of his officer-safety pat-down procedure, Heiser asked whether Long had anything in his pockets. Long immediately stuck his hand in his pocket, prompting Heiser to order him to withdraw it. As Long did so, a small piece of paper fell to the ground. Having seen drugs stored in many types of innocuous items like paper, Heiser examined the piece of paper and discovered a small amount of what appeared to him to be methamphetamine, whereupon he placed Long under arrest for possession. The subsequent search of Long's vehicle revealed a cooler containing fifteen bags of methamphetamine and several thousand dollars that he and Albers intended to use to purchase another ten ounces from their regular supplier.

## II. Constitutionality of the Stop

"When reviewing a district court's denial of a motion to suppress, we examine the findings of fact for clear error and review *de novo* whether the investigatory stop and search violated the Fourth Amendment." United States v. Gilliam, No. 07-2645, slip op. at 3, 2008 WL 861369, at *2 (8th Cir. April 2, 2008) (internal quotation omitted).

-3-

Long argues that the initial traffic stop was illegal because Heiser lacked reasonable suspicion that Long was involved in illegal activity. Police may "briefly stop a moving automobile to investigate a reasonable suspicion that its occupants are involved in criminal activity." United States v. Winters, 491 F.3d 918, 921 (8th Cir. 2007) (internal quotation omitted). Reasonable suspicion must be based on "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the investigative stop." Id. (internal quotation omitted). Reasonable suspicion requires more than a general hunch, but only that "police articulate some minimal, objective justification for an investigatory stop." United States v. Fuse, 391 F.3d 924, 929 (8th Cir. 2004). The standard is less difficult to meet than the probable cause standard required for arrests. United States v. Spotts, 275 F.3d 714, 718 (8th Cir. 2002). Because Long's erratic driving gave Heiser reasonable suspicion that Long was impaired, the district court did not err in finding that the initial stop was justified.

In addition to the evidence of Long's possible intoxication, Heiser's observation of Long's traffic violation gave him probable cause to stop the vehicle. United States v. Chatman, 119 F.3d 1335, 1339-40 (8th Cir. 1997); see Pennsylvania v. Mimms, 434 U.S. 106, 109 (1977). "[T]he stop is valid even if the police would have ignored the traffic violation but for their suspicion that greater crimes are afoot." Chatman, 119 F.3d at 1340 (internal quotation omitted). Whether a traffic stop is appropriate is not affected by an officer's subjective motivations. Id. Crossing the yellow center line constitutes a violation that allows an officer to stop the motorist and issue a citation. See Mo. Rev. Stat. § 304.015.2.

Long next argues that even if the initial stop was valid, it was unconstitutionally extended because Heiser asked for consent to search the car after finding no evidence of intoxication or other impairment. Generally, a stop should last no longer than is necessary to confirm or dispel the officer's suspicions. United States v. Jones, 269 F.3d 919, 924 (8th Cir. 2001). Whether the length of a detention is reasonable is

determined on the facts of each case. United States v. Olivera-Mendez, 484 F.3d 505, 509-10 (8th Cir. 2008). A stop may be extended for a length of time sufficient to enable the apprehending officer to ask the driver to step out of the vehicle or wait in the patrol car, to ask about the motorist's destination and purpose, to check the validity of the driver's license and registration, and to check the driver's criminal history for outstanding warrants. Jones, 269 F.3d at 924. Asking an off-topic question, such as whether a driver is carrying illegal drugs, during an otherwise lawful traffic stop does not violate the Fourth Amendment. Olivera-Mendez, 484 F.3d at 510. Asking for consent to search does not violate the Fourth Amendment in the absence of coercive or otherwise unusual circumstances. United States v. Yang, 345 F.3d 650, 654 (8th Cir. 2008). At the time Heiser asked for consent, he had neither run a check on Long's license nor written any citation for the center line violation, so the legitimate purposes for the stop had not yet ceased. Because no coercive or otherwise unusual circumstances were present, and because Heiser's request for consent to search was made during a reasonable period of detention, no Fourth Amendment violation occurred.

Our holding that Long was not unconstitutionally detained disposes of his argument that his detention rendered his consent to search involuntary.

### III. Sentencing

The district court adopted the quantity determinations set forth in the presentence report, which resulted in Long's base offense level being set at level 38. Long argues that an inconsistency in the presentence report made it impossible for the government to have met its burden of proof regarding the amount of drugs for which Long was responsible.

The inconsistency that Long notes concerns the amount of actual (pure) methamphetamine for which Long was sentenced. The district court did not address

this issue because Long did not raise it expressly at the sentencing hearing or in his objections to the presentence report. His objections at that time were to the quantity of drugs attributable to him apart from the drugs found in the car, which would include the amount estimated from his admissions to investigators about the July and August sales, the drugs Albers sold while he was incarcerated during September and October, and the ten ounces that he and Albers were planning to buy with the cash seized. The lab report that was submitted as evidence at the sentencing hearing analyzed the drugs found in the car, the quantity of which Long did not object to. An argument raised for the first time on appeal is reviewed for plain error only. United States v. Willis, 433 F.3d 634, 637 (8th Cir. 2006). We find no such error here, for Long's contention regarding the alleged inconsistency depends upon his post-sentencing extrapolation of drug purity percentages, hardly the type of error that can fairly be characterized as plain.

Even if reviewed under the standard applied to preserved claims of error, Long's now-raised claim fails. The government must prove by a preponderance of the evidence the amount of drugs for which a defendant is to be punished. United States v. Minnis, 489 F.3d 325, 329 (8th Cir. 2007). "The government may prove the total quantity of actual methamphetamine in a series of transactions by testing the purity of a seized quantity and applying the percentage of actual methamphetamine in the tested quantity to the unrecovered quantities." United States v. Houston, 338 F.3d 876, 879 (8th Cir. 2003). Long does not take issue with the lab report; he asserts only that the presentence report was internally inconsistent. The lab report stated that the methamphetamine found in the car with Long was 44% actual methamphetamine. The total amount of drugs for which Long was found to be responsible was 140 ounces, or 3.97 kilograms, of methamphetamine. This amount was based on Long's admissions of how much methamphetamine he had bought during July and August of 2004 and did not include the drugs found in the car with him the night he was arrested or the drugs distributed by Albers while Long was imprisoned. Based on these two numbers, Long was responsible for approximately 1.75 kilograms of actual

-6-

methamphetamine. The base offense level for crimes involving 1.5 kilograms or more of actual methamphetamine is 38. <u>See</u> United States Sentencing Commission, <u>Guidelines Manual</u>, § 2D1.1(1). Accordingly, we find no error in the district court's drug quantity determination and perforce no error in its offense level calculation.

The judgment is affirmed.

_____