# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-2538

_____

United States of America,      *
     *
        Appellant,      *
     *    Appeal from the United States
     v.      *    District Court for the
     *    Eastern District of Arkansas.
Omar Rivera,      *
     *
        Appellee.      *

_____

Submitted: January 15, 2009
Filed: July 6, 2009

_____

Before BYE, COLLOTON, and GRUENDER, Circuit Judges.

_____

COLLOTON, Circuit Judge.

Arkansas State Police troopers found approximately 5000 grams of cocaine hidden in Omar Rivera's vehicle during a traffic stop in September 2007. After a grand jury indicted Rivera for possession with intent to distribute cocaine, Rivera moved to suppress his statements made during the traffic stop and the evidence found in his vehicle. The district court granted Rivera's motion. The government appeals, and we reverse and remand for further proceedings.

## I.

On the morning of September 2, 2007, Arkansas State Police Trooper Victor Coleman was on duty with his certified narcotics dog. While parked on the shoulder of eastbound Interstate 40 in central Arkansas, Coleman observed a truck speeding and driving too close to another vehicle. Rivera was driving the truck. Coleman stopped the truck at approximately 10:23 a.m., and approached the passenger door of the truck.

Coleman asked for Rivera's driver's license and registration, and informed Rivera that he was stopped for driving too close to the vehicle in front of him. He also inquired about the purpose of Rivera's trip, and Rivera answered that he was traveling to Memphis, Tennessee, to pick up his family. Coleman asked what Rivera's family was doing in Memphis, and after some inaudible and confused responses, Rivera eventually confirmed that his wife went on a trip to visit his mother-in-law. During this conversation, Rivera also told Coleman that he was employed as a painter, and Coleman observed that Rivera had two cell phones with him in the truck.

About a minute and a half into the stop, Coleman asked Rivera to step out of the vehicle, and they moved to the rear of Rivera's truck. Coleman continued to question Rivera about how his family got to Memphis, and whether Rivera had previously been arrested. Rivera stated that he had been issued a traffic ticket a few hours earlier, and he retrieved the ticket from his truck for Coleman to review. Coleman again asked whether Rivera had been arrested, and Rivera did not answer, instead commenting that the truck in front of him on Interstate 40 had caused the traffic violation by slowing down. Coleman asked where Rivera's mother-in-law lived in Memphis, and Rivera responded that he did not know. Coleman then inquired how Rivera would find his wife when he got to Memphis. After some additional inaudible and confused responses, Rivera eventually said that he would need to call her.

At the conclusion of this dialogue, approximately four and a half minutes into the stop, Coleman asked whether Rivera had guns or anything illegal in the truck. When Rivera answered, "No," Coleman asked if he could search the truck. Rivera said, "Yeah," and Coleman again confirmed, "You don't mind if I search the vehicle?" Rivera responded, "You can look in." Coleman then instructed Rivera to sit in the front seat of the patrol car, where Coleman continued to question Rivera about how he was going to contact his family once he arrived in Memphis.

At approximately 10:29 a.m., or six minutes into the traffic stop, Coleman used his radio to report the stop and to provide Rivera's personal information for a records check. While waiting for the results of the check, Coleman continued to talk with Rivera about where Rivera purchased the truck, when he began his trip to Memphis, and how he was going to meet his family in Memphis. Coleman again asked whether he could search Rivera's truck, and Rivera again responded, "Yeah." Coleman then told Rivera that he wanted him to read a consent form before he performed the search, and asked whether Rivera better understood English or Spanish. Rivera said that he preferred Spanish, and asked whether he was receiving a warning. Coleman responded, "I just gave you a warning," and they discussed how fast Rivera had been traveling. Coleman gave Rivera a Spanish consent form with instructions to initial "yes" or "no." Over the next two and a half minutes, there was little conversation while Rivera read the form, although Coleman briefly asked again about whether Rivera had a phone number for a family member in Memphis and inquired about Rivera's employer.

Coleman received the results of the records check at approximately 10:37 a.m., and then asked Rivera, "What do you think?" Rivera said that he was not finished reading the form, so Coleman waited in silence. About a minute later, Rivera asked, "What you say, if me say no?" Coleman replied, "Yeah, I'll just run the dog around it or whatever if you say no." Rivera then said, "No," that he did not want to give consent to search, at approximately 10:39 a.m. By this time, Coleman's partner had

-3-

arrived on the scene, and Coleman immediately asked Rivera to step out of the patrol car and sit in his partner's vehicle. Coleman began walking the drug dog around the truck about one minute later, and the dog alerted to narcotics at the front of the truck. The entire dog sniff was completed within forty seconds, by approximately 10:41 a.m., and about seventeen minutes after Rivera was first stopped.

Following the dog's alert, Coleman and his partner searched Rivera's truck. They did not find anything while searching at the side of the road, so they moved the truck to a nearby wrecker service, where they performed a more complete search. The troopers eventually found 5000 grams of cocaine hidden under the truck's windshield.

After he was indicted, Rivera moved to suppress the cocaine and any statements he made during the traffic stop, claiming that the traffic stop was an unreasonable seizure in violation of the Fourth Amendment. After a hearing, the district court granted the motion, concluding that Rivera was unlawfully detained without reasonable suspicion beyond "the point when the initial traffic stop should have ended." *United States v. Rivera*, No. 4:07-CR-00311, 2008 WL 2397518, at *5 (E.D. Ark. June 11, 2008). The court reasoned that the initial traffic stop should have ended after Coleman "ran a check on Defendant's license and vehicle registration," and the court rejected the government's arguments that Rivera's demeanor, his responses to Coleman's questions, his route of travel, and the fact that he had two cells phones gave Coleman reasonable suspicion to continue the detention after this point. *Id.* The court also determined that the additional detention "after the initial stop ended" was not *de minimis* because Coleman used a "blended process of asking interdiction questions while asking routine traffic-stop questions," and that "[t]his lengthened the time of [Rivera's] detention." *Id.* at *6 (internal quotation omitted). The court concluded that "[b]ut-for Defendant's unjustifiably prolonged detention," Coleman would not have decided to conduct the dog sniff, and the evidence would not have been seized. *Id.* We review the district court's findings of fact for clear error and its

conclusions of law *de novo*. *United States v. Williams*, 477 F.3d 974, 975 (8th Cir. 2007).

## II.

Rivera does not dispute that Trooper Coleman lawfully stopped Rivera based on probable cause that he was speeding and following too closely. *See Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977) (per curiam); Ark. Code § 27-51-305. Likewise, it is clear that the dog's alert provided Coleman probable cause to conduct the search of the truck that eventually yielded the cocaine, *see United States v. Bloomfield*, 40 F.3d 910, 919 (8th Cir. 1994) (en banc), and that a dog sniff of the exterior of a vehicle during a lawful traffic stop does not violate the Fourth Amendment. *Illinois v. Caballes*, 543 U.S. 405, 409-410 (2005). Thus, if Rivera was lawfully seized when the dog sniff of his truck occurred, then there was no violation of Rivera's Fourth Amendment rights. Suppression of the evidence may be appropriate only if the seizure turned unlawful because it was "prolonged beyond the time reasonably required to complete" the traffic stop, *id.* at 407, and the extended seizure was "a but-for cause" of discovering the cocaine. *United States v. Peralez*, 526 F.3d 1115, 1121 (8th Cir. 2008) (internal quotation omitted).

In arguing that the district court's order should be affirmed, Rivera identifies two grounds for concluding that the traffic stop was unreasonably prolonged before Coleman developed probable cause to search Rivera's truck. First, relying on *dicta* in *Peralez*, *see United States v. Suitt*, No. 08-2688, 2009 WL 1794695, at *4 (8th Cir. June 25, 2009), he contends that the trooper unjustifiably prolonged the stop during the first fifteen minutes by using a "blended process," that is, by mixing drug-interdiction questions with routine traffic stop inquiries. *See Peralez*, 526 F.3d at 1120.

Although Trooper Coleman did ask some questions that were not directly related to the purpose of a traffic stop during the course of the seventeen-minute event, we conclude that Coleman's inquiries did not create an unreasonable seizure. During the first four to six minutes of the encounter, much of Trooper Coleman's exchange with Rivera related to the traffic stop. He requested Rivera's license and registration, explained the reason for the stop, and inquired into the destination and purpose of Rivera's trip, his criminal history, and the details of his previous traffic ticket earlier that day. These are permissible incidents of a routine traffic stop. *United States v. Long*, 532 F.3d 791, 795 (8th Cir. 2008); *Peralez*, 526 F.3d at 1119. To the extent this questioning took longer than usual, the extra time can largely be attributed to Rivera's confused answers and language difficulties, which reasonably necessitated Coleman's repeated follow-up questions. *See Peralez*, 526 F.3d at 1119 (noting that when "complications arise" during the routine tasks of a traffic stop, a longer detention is reasonable).

While it is true that Coleman's early questions about Rivera's occupation and whether Rivera had guns or anything illegal in the truck were off the topic of the traffic stop, these brief inquiries did not measurably extend the seizure. A trooper who has stopped a motorist based on probable cause "does not violate the Fourth Amendment by asking a few questions about matters unrelated to the traffic violation, even if this conversation briefly extends the length of the detention." *Olivera-Mendez*, 484 F.3d at 510. As the Supreme Court recently reiterated, "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Arizona v. Johnson*, 129 S. Ct. 781, 788 (2009). This case is unlike *Peralez*, where the officer's off-topic questioning about drug trafficking "more than doubled" the length of the sixteen-minute detention, 526 F.3d at 1121, and Coleman did not unreasonably prolong Rivera's detention during the first four to six minutes of the traffic stop.

Four and a half minutes into the stop, Rivera gave oral consent to the search of his truck. A trooper may extend a traffic stop beyond its normal completion if the encounter has become consensual. *Peralez*, 526 F.3d at 1120. When a motorist gives consent to search his vehicle, he necessarily consents to an extension of the traffic stop while the search is conducted, and Trooper Coleman reasonably could rely on Rivera's oral consent as a basis to extend the encounter. *See United States v. Benitez*, 531 F.3d 711, 715 (8th Cir. 2008); *cf. United States v. Machuca-Barrera*, 261 F.3d 425, 435 (5th Cir. 2001) (holding that "[a]fter Machuca-Barrera consented to a search, Agent Holt needed no justification to prolong the encounter" at an immigration checkpoint stop). In any event, only ninety seconds later, Coleman submitted Rivera's license and registration information over the radio, and then waited nine minutes for a reply. This records check was a permissible incident of the traffic stop, and did not unreasonably prolong it. *Long*, 532 F.3d at 795; *United States v. Brigham*, 382 F.3d 500, 509 (5th Cir. 2004) (en banc).

Rivera's second main contention is that the initial traffic stop should have ended when Coleman received a radio response to the check on Rivera's license and registration, but that the trooper impermissibly detained Rivera for another three and a half minutes before the drug dog alerted. *See Rivera*, 2008 WL 2397518, at *5. Rivera argues that because the trooper lacked reasonable suspicion to justify a continued detention, he was required to release Rivera when the license check was completed.

We disagree that the trooper unreasonably prolonged the seizure after the records check was completed. As noted, Rivera had given oral consent for Coleman to search his truck well before Coleman received the results of the records check. Rivera first consented to a search approximately four and a half minutes into the stop, and he reiterated his consent several minutes later, after Coleman had started the records check. Once Rivera gave his oral consent to a search of his vehicle, it was reasonable for Coleman to continue the encounter in reliance on this consent.

Rivera argues that Coleman's effort to have Rivera sign a written consent form demonstrates that the trooper did not reasonably believe that Rivera had consented orally to a search of the truck. But the trooper's decision to seek written consent is not inconsistent with reasonable reliance on oral consent. Litigation over the validity of consent to search is common, and a prudent law enforcement officer may use a written consent form both to protect the rights of the motorist and to minimize the potential for disputes about the validity of consent in any future court proceedings.

Rivera was still reading the consent form and deciding whether to reaffirm his consent to search when Coleman received the results of the records check. Coleman immediately asked Rivera what he had decided, but Rivera told him he had not finished reading the form. Rivera took another minute before he ultimately decided not to sign the written consent form. An officer does not violate the Fourth Amendment by asking a person for consent to search and waiting for a reply. *See United States v. Yang*, 345 F.3d 650, 654 (8th Cir. 2003). Thus, the period after the records check during which Rivera continued to consider the written consent form was not an unlawful detention.

As soon as Rivera declined to execute the written consent form, Coleman promptly walked the dog around Rivera's truck, where it alerted. This took less than two minutes. Our cases hold that such a brief detention for a dog sniff at the end of a traffic stop is *de minimis* and does not violate the Fourth Amendment. *United States v. Alexander*, 448 F.3d 1014, 1016-17 (8th Cir. 2006); *United States v. $404,905.00 in U.S. Currency*, 182 F.3d 643, 649 (8th Cir. 1999).

In sum, we conclude that Trooper Coleman did not unreasonably extend the seizure of Rivera prior to the completion of the routine records check, and that he reasonably kept Rivera in the patrol car after the records check until Rivera decided whether to execute the written consent form. When Rivera declined to sign the form, Coleman immediately conducted the dog sniff, and this *de minimis* extension of the

seizure did not violate the Fourth Amendment. The dog sniff produced probable cause to search, which justified the balance of the detention.

*　　　*　　　*

For these reasons, the district court's order suppressing the evidence is reversed, and the case is remanded for further proceedings.

_____