# United States Court of Appeals
## For the Eighth Circuit

_____

No. 12-2874
_____

United States of America,

*Plaintiff - Appellee*,

v.

Ricky W. Mariano,

*Defendant - Appellant*.

_____

Appeal from United States District Court
for the District of Minnesota - St. Paul

_____

Submitted: March 15, 2013
Filed: September 9, 2013

_____

Before WOLLMAN and COLLOTON, Circuit Judges, and HOLMES,[1] District
Judge.

_____

COLLOTON, Circuit Judge.

A jury found Ricky W. Mariano guilty of two counts of theft of mail matter, in
violation of 18 U.S.C. § 1708, two counts of destruction of letter boxes, in violation

_____

[1]The Honorable P.K. Holmes, III, Chief Judge, United States District Court for
the Western District of Arkansas, sitting by designation.

of 18 U.S.C. § 1705, one count of bank fraud conspiracy, in violation of 18 U.S.C. §§ 1344 and 1349, one count of aiding and abetting attempted bank fraud, in violation of 18 U.S.C. §§ 1344 and 2, and one count of aiding and abetting aggravated identity theft, in violation of 18 U.S.C. §§ 1028A and 2. The district court[2] sentenced Mariano to a total term of 70 months' imprisonment, which included a consecutive term of 24 months' imprisonment for aggravated identity theft. Mariano challenges only his conviction for identity theft, charged as Count 14 in the indictment. He contends that the district court's jury instructions and the government's presentation of the case constructively amended the indictment, and that the evidence adduced at trial was insufficient to support the conviction. We affirm.

I.

Mariano and several others participated in a scheme to steal checks and credit cards. The conspirators obtained the checks and credit cards in various ways, including by breaking into post boxes to steal checks enclosed in outgoing United States mail. Using a common cleaning product, the conspirators "washed" the stolen checks to remove the date, payee, payment amount, and signature inked on the check by the lawful account holder. Some members of the conspiracy also burgled vehicles and stole credit and bank cards, passports, and other identity cards. The conspirators used the washed checks and stolen cards without authorization to purchase high-value electronics or other goods at retail stores, which they resold or returned for cash, or traded the stolen checks or cards with each other in exchange for money or drugs.

At trial, several cooperating co-conspirators described Mariano's role in the enterprise. James Newton Hahne, Jr., stated that Mariano directed him to post boxes that Mariano believed might prove especially lucrative, showed Hahne how to remove

_____

[2]The Honorable Donovan W. Frank, United States District Judge for the District of Minnesota.

ink from stolen checks, and provided Hahne and others with checks that Mariano himself had washed, in return for a fee of half of the face value at which the conspirator ultimately negotiated the check.

James Edward Freeman testified that Mariano gave him methamphetamine in exchange for credit cards that Freeman had stolen from parked cars. Freeman added that Mariano generally would offer the stolen checks and cards to a different conspirator rather than use the checks or cards himself because, as Mariano told Freeman, he believed "he looked too much like a drug user and a criminal" to impersonate lawful account holders successfully.

Jacob Dutton stated that he and Mariano broke into multiple post boxes together while under the influence of methamphetamine, with Dutton acting as the driver. Mariano kept the checks that he and Dutton extracted from the mail, washed them, "divvied up" the haul in "his discretion" among the other members of the conspiracy, and directed "who would do what and how much he would get" for each check. On one occasion, Dutton observed between forty-five and sixty freshly washed checks drying on a metal rack in the kitchen of Mariano's home.

Events of March 9, 2011, are important to the prosecution of Mariano for identity theft. Michael Robert Drexl arrived at Dutton's home with a wallet that Drexl had stolen from a parked car. Dutton and Mariano were present. The wallet belonged to a victim identified in the indictment as S.B., and contained three credit or bank cards, including a Capital One credit card.

At trial, Dutton recalled that Drexl "insisted" on keeping a particular credit card for his own use, but could not remember who removed the remaining two credit cards from the wallet. Drexl testified that he was indifferent to which conspirator used the credit cards, so long as he received a portion of the profits. Ultimately, Mariano and Dutton received two stolen cards from Drexl, including the Capital One credit card.

Mariano and Dutton discussed where and how to use the stolen cards. They eventually settled on a plan to purchase electronics from a nearby Walmart and share the proceeds. At some point, Mariano and Dutton decided that Dutton would be the first to use the stolen Capital One credit card inside the store, and that he would then give it to Mariano to use. Dutton, who had never before presented a stolen card to a store cashier, stated that "didn't want" to use the Capital One credit card. He ultimately assented after Mariano "put on" a "guilt trip" and told Dutton that he "never followed through with using anything." Dutton testified that he and Mariano each handled the stolen Capital One credit card at some point during the Walmart trip. When asked to specify when each man possessed the card, Dutton answered, "You know, I cannot believe that I had the card going into the store."

Photographs and video recorded by Walmart surveillance cameras showed Mariano and Dutton entering the store and perusing the electronics section together. The men took turns pushing a shopping cart. Mariano eventually sought out a Walmart employee to unlock a case containing a PlayStation. After the store employee removed the PlayStation from the locked case, Dutton proceeded to a sales register in the electronics section and handed a cashier the stolen Capital One credit card. The cashier asked Dutton for identification, and Mariano, who was within earshot, began moving away from the area. Dutton ultimately left the store without the PlayStation, met Mariano in the parking lot, and drove away with him.

A grand jury charged Mariano by superseding indictment with offenses including three counts of aggravated identity theft, in violation of 18 U.S.C. § 1028A. This statute criminalizes the unauthorized transfer, possession, or use of another person's means of identification during and in relation to certain enumerated felonies, including bank fraud. 18 U.S.C. § 1028A(a)(1), (c)(5). The indictment listed Counts 11-15 as a group. A prefatory paragraph alleged that Mariano and a co-defendant did "knowingly transfer, possess, and use" a means of identification of another person "as alleged in each count below." Count 14 then specified that Mariano was charged with

"[u]nlawful possession and transfer of name, address, bank account number, and bank routing number of victim S.B. for $385.96 attempted credit card purchase during commission of Bank Fraud, as alleged in Count 9." Count 9 charged Mariano with attempting unlawfully to withdraw $385.96, the price of the PlayStation, from the Capital One credit account of victim S.B.

At trial, Mariano challenged only the identity theft charges and conceded his guilt on the remaining counts. The jury convicted Mariano of aggravated identity theft, as charged in Count 14, and bank fraud, as charged in Count 9. It also convicted him of two counts of theft of mail matter, two counts of destruction of letter boxes, and one count of bank fraud conspiracy. Mariano was acquitted of the remaining two charges of aggravated identity theft, listed as Counts 11 and 13 in the indictment, which did not involve victim S.B. Following the verdict, Mariano moved for a judgment of acquittal on Count 14, and the district court denied the motion. The court sentenced Mariano, and he appeals.

II.

A.

Mariano first contends that the district court constructively amended the indictment by instructing the jury that it could convict him if he "transferred, possessed or used" victim S.B.'s means of identification. As a consequence, he argues, the jury could have convicted him of unlawfully *using* or aiding and abetting the unlawful *use* of victim S.B.'s Capital One credit card, rather than unlawful possession or transfer of the card, as charged in the indictment. He complains that the problem was compounded by the government's closing argument that Mariano "used" or aided and abetted Dutton's attempt to "use" the stolen Capital One credit card.

Not only did Mariano raise no objection to the district court's inclusion of "use" in the jury instruction, but he affirmatively requested the language. Before trial, Mariano submitted the following proposed instruction:

> The crime of aggravated identity theft, as charged in Counts 11, 13, and 14 of the indictment, has four elements, which are:
>
> > *One*, the defendant knowingly [transferred] [possessed] [used] the (specify means of identification transferred, possessed, or used);
> >
> > *Two*, the defendant knew that the (specify means of identification) the defendant [transferred] [possessed] [used] belonged to another actual person;
> >
> > *Three*, the defendant [transferred] [possessed] [used] the (specify means of identification) without lawful authority; and,
> >
> > *Four*, the defendant [transferred] [possessed] [used] the (specify means of identification) during and in relation to the crime of bank fraud, as charged in Counts 8 and 9 of the indictment.

R. Doc. 328, at 22 (brackets in original). The bracketed material left ambiguity about the elements, but a later colloquy was more precise.

Following the close of evidence, the district court discussed the jury instructions with the parties. Mariano asked to be excused and the district court granted his request, after confirming that he understood his right to be present and cautioning him that the court would "be making some decisions about the jury instructions." During the subsequent colloquy, Mariano's attorney requested that the court read a separate instruction for each count of identity theft, and gave an example of the language for Count 11:

[I]f we get to where are the elements here for Counts 11, 13, and 14, for example?  I would request that each count, the Court read the instructions for each count.  For example, if it were Count 11, it would read, first, the Defendant knowingly *transferred possessed or used* another's means of identifications [sic], specifically G.M. . . .  Second, the Defendant knew the means of identification it then transferred belonged to [G.M.], *and it should read that way for each count.*"

Tr. 552-53 (emphases added).  Like Count 14, Count 11 charged Mariano with unlawful "possession and transfer" of another's means of identification, but Mariano's counsel requested in this colloquy that the court instruct the jury about transfer, possession, or use.

The district court determined to give just one instruction on identity theft—using Mariano's proposed language—along with an admonition that the jury must consider each count separately and return a separate verdict on each.  Mariano's counsel responded that he would "just work with that," and that there was no need "to redo" the instructions.  So the court instructed the jury that it could convict Mariano if the government proved that he knowingly transferred, possessed, or used, or aided and abetted the transfer, possession, or use of another's means of identification.  In closing argument, the government argued that Mariano and Dutton had "used" victim S.B.'s Capital One credit card, and that Mariano had committed identity theft by "using" it.  The jury convicted on Count 14.

Mariano argues on appeal that because Count 14 of the indictment charged only that Mariano had possessed and transferred S.B.'s means of identification, the district court's instructions constructively amended the indictment by adding the element of "use."  An indictment is constructively amended "when the essential elements of the offense set forth in the indictment are altered, either actually or in effect, by the prosecutor or the court after the grand jury has passed upon them," *United States v. Begnaud*, 783 F.2d 144, 147 n.4 (8th Cir. 1986), thereby creating a "substantial

likelihood" that the petit jury convicted the defendant of an offense that the grand jury had not charged. *United States v. Johnson*, 934 F.2d 936, 941 (8th Cir. 1991); *see also Stirone v. United States*, 361 U.S. 212, 217-19 (1960).

This court long has held, however, that a defendant "is in no position to challenge the giving of an instruction which he has requested." *Petschl v. United States*, 369 F.2d 769, 774 (8th Cir. 1966); *see United States v. Friedman*, 506 F.2d 511, 515 (8th Cir. 1974); *Bianchi v. United States*, 219 F.2d 182, 194 (8th Cir. 1955). In other words, the defendant has "invited" the alleged mistake, and "there can be no reversible error." *United States v. Wisecarver*, 598 F.3d 982, 988 (8th Cir. 2010) (internal quotation omitted). *Cf. Dennis v. United States*, 341 U.S. 494, 500 n.2 (1951) ("[P]etitioners themselves requested a charge similar to the one given, and under Rule 30 of the Federal Rules of Criminal Procedure would appear to be barred from raising this point on appeal."). Despite a suggestion in *Stirone* that a constructive amendment is not subject to harmless error analysis, 361 U.S. at 217, a defendant may forfeit a challenge to a constructive amendment, *United States v. Gavin*, 583 F.3d 542, 546-47 (8th Cir. 2009); *a fortiori*, he can waive it.

There has been some discussion after *United States v. Olano*, 507 U.S. 725 (1993), about whether an "invited error" in a jury instruction is a "waiver" that precludes appellate review, or merely a "forfeiture" that permits review for plain error under Federal Rule of Criminal Procedure 52(b). Waiver is the "intentional relinquishment or abandonment of a known right," *Olano*, 507 U.S. at 733 (internal quotation omitted), whereas forfeiture is "the failure to make the timely assertion of a right." *Id.* A divided *en banc* panel of the Ninth Circuit concluded that *Olano* required it to "reformulate" its "invited error" doctrine to "consider whether the defendant intentionally relinquished or abandoned a known right." *United States v. Perez*, 116 F.3d 840, 845 (9th Cir. 1997) (en banc). A six-judge majority determined that it must consider whether there "is evidence in the record that the defendant was aware of, *i.e.,* knew of, the relinquished or abandoned right." *Id.* at 845. A five-judge

concurrence objected that *Olano* said nothing about "invited error," that it is impractical to search for evidence of defense counsel's mental state, and that other circuits had applied the invited error rule without change after *Olano*. *Id*. at 849-53 (Kleinfeld, J., concurring in the judgment). The Third Circuit seems to have followed *Perez* in one case, *Gov't of Virgin Islands v. Rosa*, 399 F.3d 283, 291-92 (3d Cir. 2005), but it has not done so consistently. *See United States v. Holmes*, 607 F.3d 332, 335 (3d Cir. 2010).

We do not think *Olano* justifies a departure from our panel precedents that a defendant who requests and receives a jury instruction may not challenge the giving of that instruction on appeal. *Wisecarver*, a post-*Olano* decision from this circuit, treated as "fundamental" the rule that an "invited error" on a jury instruction is not reversible, 598 F.3d at 988, and another post-*Olano* decision said in *dicta* that if the defendant had proposed the very jury instructions to which he objected on appeal, then he "would of course have waived his right to object to them." *United States v. Pinque*, 234 F.3d 374, 377 (8th Cir. 2000) (citing *Olano*, 507 U.S. at 732-33). *See also United States v. Maxie*, 294 F. App'x 247, 249 (8th Cir. 2008) (per curiam). Several circuits have followed a comparable approach after *Olano*. *See United States v. Natale*, 719 F.3d 719, 729-31 (7th Cir. 2013); *United States v. Souffrant*, Nos. 10-11579, 10-11603, 2013 WL 1748723, at *11-12 (11th Cir. Apr. 23, 2013); *United States v. Demmler*, 655 F.3d 451, 458-59 (6th Cir. 2011); *United States v. Spivey*, 129 F. App'x 856, 859 (4th Cir. 2005) (per curiam); *cf. United States v. Jefferson*, 432 F. App'x 382, 387-88 (5th Cir. 2011) (request to "leave the instructions as they are" is waiver); *United States v. Hansen*, 434 F.3d 92, 101 (1st Cir. 2006) (statement that counsel was "content" with the jury instruction is waiver).

*Olano* said that whether and how a right is waivable depend on the right at stake. 507 U.S. at 733. A defendant need not personally waive objections to jury instructions, as they raise questions of law to be handled by counsel. *United States v. Perez*, 612 F.3d 879, 883 (7th Cir. 2010). The *Olano* decision, therefore, does not

seem inconsistent with our longstanding precedent that when a defendant specifically requests a particular instruction, he gives up the right to appeal any error in that instruction. Under *Olano*, moreover, a court of appeals retains discretion whether to correct a forfeited error, and should do so only if an error affects the fairness, integrity, or public reputation of judicial proceedings. 507 U.S. at 735-37. If proposing an instruction is not waiver of the right to challenge it on appeal, then our "invited error" cases also could be understood as a categorical conclusion that a conviction based on a mistaken jury instruction that was specifically requested by the defendant does not result in a miscarriage of justice. *See United States v. Lespier*, No. 12-4266, 2013 WL 3988769, at *10 (4th Cir. Aug. 6, 2013); *cf. United States v. Gomez*, 705 F.3d 68, 76 (2d Cir.), *petition for cert. filed*, 81 U.S.L.W. 3618 (U.S. Apr. 6, 2013) (No. 12-1212).

Mariano specifically requested that the jury be instructed about transfer, possession, *and use* of a means of identification. He cannot challenge on appeal the court's giving of the precise instruction that he requested. The government's closing argument simply applied the instruction that Mariano requested and received, so it was not improper.

In a related contention, Mariano asserts that the district court constructively amended the indictment by listing "credit card account number" as an "example" of a "means of identification," although Count 14 did not mention a credit card account number. The indictment listed "credit card account number" as a "means of identification" in the prefatory paragraph for Counts 11-15, but charged in Count 14 that Mariano committed "[u]nlawful possession and transfer of *name, address, bank account number, and bank routing number* of victim S.B. for $385.96 attempted credit card purchase during commission of Bank Fraud as alleged in Count 9." Count 9, in turn, charged the "[a]ttempted unlawful withdrawal of $385.96 from Capital One credit card account XXXXXXXXXXXX2611 of victim S.B."

Mariano did not raise this objection at trial, and there is no plain error for two reasons. First, although the court gave examples of "means of identification," the instruction also specified the means of identification at issue in Count 14 in the same language as the indictment: "name, address, bank account number, and bank routing number of victim S.B. for $385.96 attempted credit card purchase during commission of Bank Fraud as alleged in Count 9." The jury was thus advised about which means of identification were encompassed by the allegations in Count 14. Second, there is at least a reasonable dispute about whether Count 14 of the indictment—by cross-referencing the "attempted credit card purchase" alleged in Count 9, which in turn listed S.B.'s credit card account number as a means of identification—fairly informed Mariano that S.B.'s credit card account number was a means of identification at issue under Count 14. *Cf. United States v. Pemberton*, 121 F.3d 1157, 1169 (8th Cir. 1997); *United States v. Morris*, 18 F.3d 562, 568 (8th Cir. 1994). Any imprecision in the instructions on this point does not rise to the level of a plain error.

Mariano also claims there was a constructive amendment because the jury instructions permitted a conviction based on uncharged conduct involving a second credit card that Drexl had stolen from victim S.B. He complains that the instructions did not limit the jury's consideration to specific means of identification, and that the government referred to this second stolen card in its closing argument.

Again, Mariano did not object to the jury instructions or closing argument, and there was no plain error warranting relief. The government's theory on Count 14, as reflected in the indictment and in closing argument, involved S.B.'s stolen credit card ending in 2611 and the attempted purchase at Walmart. The jury's questions about Count 14, which can enlighten a reviewing court, *see United States v. Robertson*, 606 F.3d 943, 956 (8th Cir. 2010), likewise focused on the stolen Capital One credit card and the trip by Mariano and Dutton to Walmart. The jury instructions referred specifically to the attempted credit card purchase that was charged in the indictment, while making no mention of the second stolen card. The government's reference in

-11-

argument to the second card was only fleeting. The district court instructed the jury that Mariano was not on trial for any acts or crimes not charged in the indictment. Under these circumstances, there is no substantial likelihood that Mariano was convicted of an uncharged offense involving a second credit card.

For these reasons, we reject Mariano's contention that the conviction on Count 14 should be reversed because of a constructive amendment.

## B.

We also conclude that there was sufficient evidence for the jury to convict Mariano on Count 14. Dutton testified that he and Mariano each possessed the stolen Capital One credit card at some point after receiving it from Drexl, and that Mariano handed the card to Dutton at some point before Dutton gave it to the Walmart cashier. Although Dutton initially had trouble recalling whether Mariano gave him the card in the car or inside the store, a reasonable jury could have believed Dutton's testimony and inferred that Mariano held the card when the men entered the store. The evidence was sufficient for a jury to find that Mariano possessed or transferred the stolen Capital One card.

The evidence also was sufficient for a jury to find that Mariano aided or abetted the use of the stolen Capital One credit card. The jury was instructed that it must find that the government had proved, beyond a reasonable doubt, "that someone committed each of the essential elements of the offense of bank fraud and aggravated identity theft" before Mariano could be found guilty of aiding or abetting the crime. Dutton's detailed testimony provided a sufficient basis for the jury to conclude that Dutton himself attempted to use the card, and that Mariano knowingly and deliberately associated himself with and participated in that crime.

There was also sufficient evidence that Mariano acted with "some purpose or effect with respect to the commission of the crime of bank fraud," as required by the fourth element of the offense. The government presented evidence that Mariano and Dutton agreed to target the Walmart and aimed to purchase expensive merchandise with a card they knew to be stolen. Mariano and Dutton discussed who would use the credit card and decided how to divide the proceeds. And Dutton testified that Mariano had the credit card when the pair entered the store. This was a sufficient basis for the jury to find that Mariano intended to further the commission of the crime of bank fraud.

\*   \*   \*

The judgment of the district court is affirmed.

_____