# United States Court of Appeals
## For the Eighth Circuit

_____

No. 24-2774
_____

United States of America

*Plaintiff - Appellee*

v.

Shue Moua

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of Minnesota

_____

Submitted: March 19, 2025
Filed: August 1, 2025

_____

Before COLLOTON, Chief Judge, ERICKSON and GRASZ, Circuit Judges.

_____

ERICKSON, Circuit Judge.

A jury convicted Shue Moua of possession with intent to distribute methamphetamine, in violation of 21 U.S.C. § 841(a)(1) & (b)(1)(B). Moua moved to suppress the drugs found during a traffic stop of her vehicle, asserting the stop

was invalid at its inception and unreasonably prolonged. The district court[1] denied her motion and sentenced her to a 72-month term of imprisonment. Because there was reasonable suspicion of criminal activity for the traffic stop and the stop was not unreasonably extended, we affirm.

## I.    BACKGROUND

During the early morning hours of March 2, 2023, a Carlton County, Minnesota Sheriff's Deputy, Nils Hansen, was parked at a Kwik Trip gas station. The weather was inclement, and Kwik Trip's premises were covered in ice and snow. While at the Kwik Trip, Deputy Hansen observed a car park next to a gas pump. When the driver, later identified as Shue Moua, exited the car, she tripped. Realizing she was parked on the wrong side of the pump to fill gas, Moua got back inside the vehicle and repositioned her car in a manner that Deputy Hansen found odd—that is, by executing a "180-degree turn through multiple short and choppy motions." Moua's conduct caused Deputy Hansen to suspect she was impaired. Deputy Hansen also observed that the vehicle did not appear to have a rear or front license plate, nor did he notice a temporary registration tag.

Deputy Hansen followed Moua as she left the gas station. After following her for several miles, Deputy Hansen initiated a traffic stop. As he approached the car, he noticed "some type of paper" in the rear window for the first time. Moua's speech was slurred, and she could not locate insurance for the vehicle. As their conversation continued, Deputy Hansen noted Moua's eyes were bloodshot, her teeth displayed signs of drug use, and her pupils were dilated while in the beam of his flashlight. He observed a canister of pepper spray on Moua's keychain and a make-up case with cellophane sticking out of it in the back seat of Moua's car.

---

[1]The Honorable John R. Tunheim, United States District Judge for the District of Minnesota.

Because Deputy Hansen suspected Moua was impaired by a controlled substance, he asked her to submit to a series of field sobriety tests. Moua agreed. Before conducting the field sobriety tests, Moua and Deputy Hansen had a 13-minute conversation about, among other things, Moua's prior convictions. During the conversation, Deputy Hansen sought and received consent to search Moua's car.

A second squad car arrived and Moua waited in it while Deputy Hansen searched her car. After Deputy Hansen did not find anything of interest in the make-up bag, Moua revoked her consent. Deputy Hansen then paused his search and explained to Moua that he was arresting her for impaired driving and for possession of the pepper spray on her keychain. With Moua under arrest, the officers called a tow truck to impound the vehicle. Before it was towed, the officers conducted an inventory search, which revealed approximately one kilogram of methamphetamine on the passenger side by the floorboards.

Moua was charged with possession with intent to distribute methamphetamine. She moved to suppress the evidence obtained from the search of her vehicle, contending Deputy Hansen lacked reasonable suspicion to stop her vehicle and, after he stopped it, he unreasonably extended the detention. Following an evidentiary hearing, a magistrate judge recommended Moua's motion to suppress be granted on the ground that Deputy Hansen lacked reasonable suspicion to initiate a stop. After considering the government's objections, the district court found Deputy Hansen had reasonable suspicion to initiate a traffic stop for impaired driving and vehicle registration defects, and the stop was not unreasonably extended.

Moua was convicted by a jury, and the district court sentenced her to 72 months' imprisonment. Moua appeals, asserting the district court erred when it denied her motion to suppress.

## II.  DISCUSSION

The district court, relying on the magistrate judge's report and recommendation and the transcripts from the evidentiary hearing, concluded there was sufficient evidence in the record to find reasonable suspicion for the traffic stop. We review the district court's factual findings for clear error and its legal conclusions *de novo*. United States v. Austin, 104 F.4th 695, 698–99 (8th Cir. 2024).

Moua contends Deputy Hansen lacked reasonable suspicion of criminal activity to justify the stop of her vehicle. A traffic stop is a seizure under the Fourth Amendment, even if the purpose of the stop is limited and the resulting detention is brief. Brendlin v. California, 551 U.S. 249, 255 (2007). To comply with the Fourth Amendment, a traffic stop must be supported by probable cause or reasonable suspicion. United States v. Linnell, 93 F.4th 1102, 1105 (8th Cir. 2024). In Minnesota, where Moua was stopped, vehicles must display both front and rear license plates. Minn. Stat. § 169.79, subd. 1 & subd. 6. Minnesota recognizes nonresidents' registrations through reciprocity agreements, Minn. Stat. §§ 168.181, 168.187, and requires vehicles in Minnesota to display temporary registrations where a license plate would normally be affixed, Minn. Stat. § 168.092.

The district court credited Deputy Hansen's testimony that at the time he initiated the traffic stop, he did not see a license plate or registration tag on Moua's vehicle. This Court has distinguished traffic stops where an officer observes a temporary registration tag but cannot read every detail from situations where the officer is unable to see or discern whether the vehicle has a valid registration tag at all. See, e.g., United States v. Givens, 763 F.3d 987, 990 (8th Cir. 2014). In Givens, this Court contrasted a traffic stop involving an officer who saw a valid temporary tag but could not read the expiration date from the stop of a vehicle that had no metal license plates and no "readily apparent temporary paper registration card." Id. at 991. The Court determined that the first set of circumstances did not give rise to reasonable suspicion, but the second set gave the officer "an objectively reasonable basis justifying the stop of the vehicle." Id.

Deputy Hansen testified that he did not see a license plate or temporary tag on Moua's vehicle until after he stopped her. While approaching Moua's vehicle, Deputy Hansen saw "some type of paper mounted in the rear window." Although Moua points to a still photo taken from the gas station depicting her rear window, the district court found Hansen "did not see a license plate or registration on the car" and "believed that all states required a rear-mounted registration in the license plate bracket." A traffic stop may still be lawful even when an officer's initial observations are incomplete. United States v. Hollins, 685 F.3d 703, 706 (8th Cir. 2012) (citing United States v. Smart, 393 F.3d 767, 770–71 (8th Cir. 2005)).

Deputy Hansen's testimony, which the district court credited, is not inconsistent with the evidence in the record. The still images in Exhibit 1 and Exhibit 4, on which the dissent relies, are misleading when stripped of context. Exhibit 1 is an image, not from the vantage point of Deputy Hansen, but captured by an elevated security camera fixed across the parking lot from where Deputy Hansen was located. Exhibit 4 is an image from a video recorded in the headlights of Deputy Hansen's patrol vehicle after he had effectuated the traffic stop. This image is from a closer vantage point with brighter illumination than was available when Deputy Hansen initiated a stop of Moua's vehicle.

The dissent's reliance on a zoomed in image taken from an elevated vantage point is inconsistent with our precedent, which precludes using the vision of hindsight to determine whether reasonable suspicion existed at the time Deputy Hansen signaled Moua to stop. See Hollins, 685 F.3d at 706 (upholding traffic stop for no license plates, as officers did not see the In Transit sticker until after approaching the vehicle); United States v. Mendoza, 691 F.3d 954, 959 (8th Cir. 2012) (noting an officer's effort to inspect a vehicle registration tag after stopping the vehicle "has no bearing on whether [the officer] had reasonable suspicion to make the traffic stop in the first place").

With no registration in the license plate bracket and unable to see a temporary registration tag in the rear window until approaching the vehicle, Deputy Hansen

reasonably believed that a law had been violated at the time of the stop. See United States v. Foster, 15 F.4th 874, 877 (8th Cir. 2021) (noting even minor violations may establish grounds for a traffic stop). Even if Deputy Hansen was mistaken about Moua's compliance with Minnesota law, his mistake "was an objectively reasonable one." See Smart, 393 F.3d at 770 (officer reasonably suspected a violation of local license plate requirements based on his initial, incomplete observations). The district court did not clearly err when it credited Deputy Hansen's testimony that he did not see a license plate or registration tag on Moua's vehicle. In light of those facts, the district court did not err when it concluded that reasonable suspicion existed to stop Moua's vehicle.

Even if we were to assume Deputy Hansen lacked reasonable suspicion to stop Moua's vehicle based on a registration violation, the traffic stop was lawful because Deputy Hansen also had reasonable suspicion that Moua was impaired. Moua stumbled at the gas station and clumsily repositioned her car. Williams v. Decker, 767 F.3d 734, 739 (8th Cir. 2014) ("errant parking" contributed to officers' reasonable suspicion that an individual was operating a vehicle while intoxicated). Deputy Hansen testified that Moua was unable to maintain a constant position in her lane while driving and was traveling at an unusually slow speed. See Navarette v. California, 572 U.S. 393, 402 (2014) (acknowledging that erratic behavior on the road is a common sign of intoxication). After Deputy Hansen stopped Moua, he observed additional signs of impairment including slurred speech, bloodshot eyes, and persistently dilated pupils. Ultimately, officers seized nearly one kilogram of methamphetamine from Moua's vehicle. Deputy Hansen was entitled to evaluate the totality of the circumstances in deciding whether to stop Moua's vehicle, and he could reasonably suspect criminal activity despite potential innocent explanations for individual behaviors. United States v. Reddick, 910 F.3d 358, 361 (8th Cir. 2018) (citing Navarette, 572 U.S. at 403).

To the extent Moua argues that the district court should not have overruled the magistrate judge's credibility findings without first holding its own hearing, her argument was forfeited in the district court and waived on appeal. Moua did not

request a hearing in the district court when the government objected to the magistrate judge's credibility finding. Nor did she object after the district court filed its order or seek reconsideration of that order. A defendant forfeits a right when he or she fails to timely assert it. United States v. Mariano, 729 F.3d 874, 880 (8th Cir. 2013). Although this Court may review a forfeited issue for plain error, there was no obvious error. Id. at 880–81. In United States v. Raddatz, the Supreme Court observed that "[n]either the [Federal Magistrates Act] nor its legislative history reveals any specific consideration of the situation where a district judge after reviewing the record in the process of making a *de novo* 'determination' has doubts concerning the credibility findings of the magistrate." 447 U.S. 667, 681 n.7 (1980). A conflict in the circuits has developed in Raddatz's wake, and this Court has suggested that while a district court must review a magistrate judge's credibility findings *de novo*, it "need not conduct a *de novo* hearing." Taylor v. Farrier, 910 F.2d 518, 521 (8th Cir. 1990); see also United States v. Azure, 539 F.3d 904, 910 (8th Cir. 2008) (observing "*de novo* review requires that the district court either listen to the tape of the hearing or read the hearing transcript").

On appeal, Moua mentioned the argument only once, in the summary of argument section of her opening brief. She did not develop this claim by, for example, citing Raddatz or any of the court of appeals decisions on the issue left open in Raddatz. An undeveloped argument is waived. E.g., Dunn v. Does 1-22, 116 F.4th 737, 750 n.2 (8th Cir. 2024); see also Meyers v. Starke, 420 F.3d 738, 742–43 (8th Cir. 2005) ("To be reviewable, an issue must be presented in the brief with some specificity.")

Moua also contends the traffic stop was unreasonably prolonged. Stops "exceeding the time needed to handle the matter for which the stop was made" generally violate "the Constitution's shield against unreasonable seizures." Rodriguez v. United States, 575 U.S. 348, 350 (2015). As a result, "[o]nce an officer finishes the tasks associated with a traffic stop, it is unreasonable to further detain the vehicle's occupants unless something occurs during the stop to generate reasonable suspicion to justify the further detention." Austin, 104 F.4th at 699.

-7-

While Moua spent a total of 45 minutes by the side of the road, "there is no *per se* time limit on all traffic stops." United States v. Riley, 684 F.3d 758, 765 (8th Cir. 2012) (citation omitted). An officer need only act diligently to pursue the mission of the stop. United States v. Rederick, 65 F.4th 961, 967 (8th Cir.), cert. denied, 144 S. Ct. 241 (2023). An officer's mission may evolve during the stop, as when the officer develops "reasonable suspicion of drug-related activity during the routine traffic-stop tasks." Id. Likewise, "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop … do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." Arizona v. Johnson, 555 U.S. 323, 333 (2009).

Here, Deputy Hansen's suspicions evolved during the stop. As he spoke to Moua, Deputy Hansen observed additional signs of impairment: persistently dilated pupils, evidence of teeth grinding consistent with drug abuse, and slurred speech. At the same time, he noticed hallmarks of drug trafficking, such as the cellophane in Moua's make-up case. Relying on his training and experience, Deputy Hansen made a decision to investigate further. Our precedent allows law enforcement to pursue those leads by asking Moua to submit to field sobriety tests and by exploring her prior convictions. See United States v. Rivera, 570 F.3d 1009, 1013 (8th Cir. 2009) (concluding questions about a person's criminal history "are permissible incidents of a routine traffic stop"). In addition, Moua consented to prolonging the stop because "[w]hen a motorist gives consent to search his vehicle, he necessarily consents to an extension of the traffic stop." Id.

Because Deputy Hansen had reasonable suspicion to stop Moua's vehicle and the stop was not unreasonably prolonged, the district court did not err when it denied Moua's motion to suppress.

## III. CONCLUSION

We affirm the judgment of the district court.

GRASZ, Circuit Judge, dissenting.

Both in its brief and at oral argument, the United States asserted that Minnesota law requires all temporary motor vehicle registrations to be placed in the rear license plate holder and that Minnesota law makes no exceptions for vehicles registered in other states. Not surprisingly, it turns out the government's assertion is incorrect. Minnesota does not require out-of-state drivers to stop at the border and change plates or the location of their temporary registrations to avoid being pulled over. As a result, no probable cause existed for the seizure of Moua based on her vehicle's temporary Wisconsin registration. In my view, the majority opinion is inconsistent with Heien v. North Carolina, 574 U.S. 54 (2014), and fails to protect Moua's Fourth Amendment right against unreasonable seizure. And like the only judge to see and hear witness testimony at the suppression hearing, I conclude no reasonable suspicion existed to believe Moua was an impaired driver.[2] For these reasons, I respectfully dissent.

Although it takes relatively little to establish reasonable suspicion or even probable cause for a traffic stop, this is one affirmance in which I cannot silently abide. Safeguarding what little protection remains under the Fourth Amendment against unreasonable seizures by the government in the context of automobiles is simply too important. I worry our jurisprudence related to traffic stops is hollowing out what little Fourth Amendment protection exists on the road. See South Dakota v. Opperman, 428 U.S. 364, 367–68 (1976) (treating an individual's expectation of privacy as "significantly" diminished when in an automobile because, in part, it

_____

[2]Deputy Hansen's alternative theory for seizing Moua — that she was driving impaired — fairs no better than his temporary registration theory. The magistrate judge's report and recommendation thoroughly explains that the circumstances cited by Deputy Hansen did not give rise to reasonable suspicion. There is nothing suspicious about a woman slipping in an icy parking lot, driving below the speed limit when traveling behind a snowplow on a snow-covered highway, or being unable to drive perfectly straight within her lane in those conditions.

"seldom serves . . . as the repository of personal effects" (quoting Cardwell v. Lewis, 417 U.S. 583, 590 (1974))).

In this case we are dealing with the most common modern form of government seizure, the traffic stop. The familiarity of the setting should not diminish the importance of maintaining constitutional principles. On the contrary, in our highly mobile society many people spend significant portions of their lives behind the wheel (nearly eight and a half hours each week, on average). The automobile is an integral, if not indispensable, component of daily life and livelihood, and government seizures most often occur while one is in an automobile. See id. Thus, the constitutional protection against unreasonable government seizures while on the road is more important than at any time in our history.

Although the protection of the Fourth Amendment has been severely weakened in the automobile context, it is not dead. Importantly, some of the most basic Fourth Amendment principles remain the same as in other contexts. As Justice Scalia affirmed, "An automobile stop is . . . subject to the constitutional imperative that it not be 'unreasonable' under the circumstances. As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." Whren v. United States, 517 U.S. 806, 810 (1996). See also Kansas v. Glover, 589 U.S. 376, 380 (2020) (citing United States v. Cortez, 449 U.S. 411, 417–18 (1981)). True, this is not a high bar. As the majority opinion notes, even a minor violation of traffic law will suffice. See ante, at 5. Still, the Fourth Amendment does not allow fantasy violations of the law to justify the government's seizures of travelers. The Fourth Amendment tolerates mistakes by law enforcement officers — whether a mistake of fact or of law. Heien, 574 U.S. at 57, 66. However, as the Supreme Court has emphasized, "[t]he Fourth Amendment tolerates only *reasonable* mistakes, and those mistakes—whether of fact or of law—must be *objectively* reasonable." Id. at 66.

In the present case, I believe Deputy Hansen's layered mistakes of fact and law are not objectively reasonable. The test for objectivity is more than a nod to the

-10-

Constitution and a wink to the prosecution.[3]  Start with the mistake of *law*.  Deputy Hansen believed Moua was violating Minnesota law by not properly displaying her temporary registration.  Unlike the mistake of law in <u>Heien</u>, his mistake was objectively unreasonable.  In <u>Heien</u>, the officer's mistake of law was determined to be reasonable by the Court only after careful review of the statute at issue.  <u>Id.</u> at 67–68.  Specifically, the mistake was determined to be reasonable because of an ambiguity in the North Carolina statute regulating brake lights — it was unclear under the statute whether a single working lamp was sufficient.  <u>Id.</u>  Here, there is no such ambiguity in the relevant statutes.  As the majority opinion acknowledges, Minnesota allows out-of-state vehicles to operate in Minnesota without complying with Minnesota's requirement that vehicles registered in Minnesota display both a front and rear license plate.  <u>See</u> <u>ante</u>, at 4.  Similarly, Minnesota law does not require out-of-state vehicles to display temporary registrations only in the license plate holder area, as it does for Minnesota vehicles.  <u>See</u> Minn. Stat. §§ 168.092, 168.181, 168.187.

The unambiguous nature of the law — not to mention the proximity of Minnesota to states like Wisconsin, which require only one license plate and require temporary registrations to be placed in the rear window, Wis. Admin. Code Transp. § 132.04(1), just as Moua's vehicle did — shows Deputy Hansen's mistake of law was not objectively reasonable.  It is a basic proposition that "[w]e do not examine the subjective understanding of the particular officer involved."  <u>Heien</u>, 574 U.S. at 66.  Thus, a poor understanding of clear law is no excuse.  As the Supreme Court has emphasized, "[A]n officer can gain no Fourth Amendment advantage through a sloppy study of the laws he is dutybound to enforce."  <u>Id.</u> at 67.  Deputy Hansen testified he was familiar with how Wisconsin handles temporary tags.  And, as the magistrate judge noted, "Wisconsin allows for [temporary registration permits] to be displayed in the vehicle's rear window."  I agree with the magistrate judge that

---

[3]The Supreme Court has made it clear that "the inquiry is not as forgiving as the one employed in the distinct context of deciding whether an officer is entitled to qualified immunity for a constitutional or statutory violation."  <u>Heien</u>, 574 U.S. at 67.

beyond this unreasonable claim that placing the tag in the proper location for the vehicle's state of registration violated Minnesota law, "Deputy Hansen has not indicated any facts that suggested the validity of the temporary registration was suspect or in any way in violation of Minnesota or Wisconsin law."

Likewise, Deputy Hansen's alleged mistake of *fact* is not — even under clear error review — objectively reasonable. There are two problems with Deputy Hansen's claim that he did not see the temporary registration in Moua's rear window. First, the only judge to personally hear and observe Deputy Hansen's testimony found his testimony *not* credible:

> Deputy Hansen testified that he was unable to notice a temporary registration on the vehicle before initiating the traffic stop. . . . However, the registration is plainly and clearly visible from the very beginning even from a distant security camera located behind the sedan in the Kwik Trip parking lot. (See Gov't's Ex. 1). Additionally, the temporary vehicle registration can clearly be seen from Deputy Hansen's squad vehicle upon the sedan pulling over onto the shoulder. (See Gov't's Ex. 3 at 0:00:57). Finally, before approaching the driver, Deputy Hansen stopped and closely examined the temporary registration. The Court does not find it reasonable that Deputy Hansen could not have seen any indication that there was a large temporary registration placard in the rear window of Defendant's vehicle.

Based on these facts, the magistrate judge's report and recommendation stated, "the Court finds that the temporary paper registration in the present case was not obscured. As mentioned previously, the registration can clearly be seen taped to the rear driver-side window while it was in the Kwik Trip gas station parking lot."[4]

---

[4]The court's discussion begins by stating, "The district court, relying on the magistrate judge's report and recommendation . . . ." Ante, at 4. The district court, however, did not adopt the magistrate judge's recommendations and reached very different conclusions.

-12-

Further emphasizing these findings, the magistrate judge concluded:

> Deputy Hansen testified he could not see the details of the temporary registration before stopping the sedan, [but] there is no possibility that the deputy could not have seen the plainly visible temporary registration, nor is there any evidence that the deputy could have formed a reasonable suspicion there was a problem with the registration itself (such as the registration being expired or otherwise invalid). . . . [T]he deputy did not have a reasonable suspicion . . . since the stop was unlawful under the Fourth Amendment.

The district court, of course, was not bound by the magistrate judge's factual findings. However, photographic and video evidence in the record conclusively contradicts and undermines the conclusion that Deputy Hansen's mistake of fact (the erroneous belief that there was no temporary registration displayed on Moua's vehicle) was objectively reasonable. And the objectivity of this mistake is contradicted not just by a single image recorded at one location. Rather, it is undermined by images from several videos. Government Exhibit 1, page 1, and Government Exhibit 1, page 2, were recorded at the brightly lit gas station where Moua's vehicle was observed by Deputy Hansen for an extended period of time. As shown in Government Exhibit 1, page 2, and by Deputy Hansen's own testimony, Moua's back window with the large temporary registration was only 30 feet from Deputy Hansen's truck, on the same level, and with no obstructions between them. Another video image, Government Exhibit 4, was recorded along the road when Moua was pulled over, but before Deputy Hansen approached Moua.

Government Exhibits 1 and 4 are shown, along with a closer view of Moua's car in the image taken from Exhibit 1. The images show that Moua's temporary registration extended nearly half way up the left side of the vehicle's rear window.[5]

_____

[5]The court notes, "Exhibit 1 is an image, not from the vantage point of Deputy Hansen, but captured by an elevated security camera fixed across the parking lot . . . ." Ante, at 5. Indeed. Deputy Hansen had a far closer and better view than shown in Exhibit 1. He testified the distance from his truck to Moua's vehicle was only 30 feet away. The closer view, which the majority disparages, ante at 5, is a





03/02/23 1:22:28a

GOVERNMENT
EXHIBIT
1
23-CR-179 (JRT/LIB)

---

far more accurate depiction of what Deputy Hansen saw, as can be seen in Government Exhibit 1, page 2, which shows Moua's vehicle after she re-positioned it with the back window facing Deputy Hansen's truck, just 30 feet away, and at eye level.

-14-





Like the only judge to personally observe Deputy Hansen testify, I agree these images plainly contradict his testimony. And I believe they establish the district court's findings are clearly erroneous. See United States v. Prokupek, 632 F.3d 460, 462 (8th Cir. 2011). The assessment of clear error sometimes entails applying common sense, see United States v. Tuton, 893 F.3d 562, 570 (8th Cir. 2018), and I have never seen a larger or more obvious temporary registration than the one prominently displayed, and unavoidably visible, in Moua's rear window. The subjective failure of an officer to notice the obvious, like deliberate blindness, cannot support the conclusion that a mistake of fact is *objectively* reasonable. Endorsing objectively unreasonable mistakes of fact risks further hollowing out the already-diminished Fourth Amendment protections that exist any time one is in a vehicle.

I also write separately to recognize a troubling tension in the standard of review. The district court is statutorily required to conduct a de novo review of the record when reviewing the magistrate judge's objected-to credibility finding. See 28 U.S.C. § 636(b)(1); Taylor v. Farrier, 910 F.2d 518, 521 (8th Cir. 1990). We then review the district court's factual findings for clear error. Prokupek, 632 F.3d at 462. But what happens when the district court disagrees with a magistrate judge's credibility findings without presiding over a hearing: Do we still owe the district court deference on that credibility finding? A circuit split exists as to whether a district court must rehear disputed testimony before rejecting a magistrate judge's credibility findings. Compare McIntosh v. Wexford Health Sources, Inc., 987 F.3d 662, 665–66 (7th Cir. 2021) (requiring the district court to hold a separate hearing to support its own credibility determinations when it rejects the magistrate judge's credibility determinations); United States v. Scribner, 832 F.3d 252, 257, 259 (5th Cir. 2016) (same); United States v. Thoms, 684 F.3d 893, 899–900, 905–06 (9th Cir. 2012) (same); United States v. Powell, 628 F.3d 1254, 1257 (11th Cir. 2010) (same); Carrion v. Smith, 549 F.3d 583, 587–90 (2d Cir. 2008) (same); United States v. Hernández-Rodríguez, 443 F.3d 138, 147–48 (1st Cir. 2006) (same); Hill v. Beyer, 62 F.3d 474, 482 (3d Cir. 1995) (same); United States v. Orrego-Fernandez, 78 F.3d 1497, 1501 (10th Cir. 1996) (requiring a district court to rehear testimony only if the "magistrate [judge]'s credibility findings were dispositive or material to the district

court's holding"), with <u>United States v. Davis</u>, 361 F. App'x 632, 635 (6th Cir. 2010) (unpublished) ("This court answered affirmatively the question *Raddatz* left open, holding that a district court may disregard a magistrate [judge]'s credibility findings without listening to live testimony. *United States v. Saltzman*, 992 F.2d 1218, 1993 WL 100082, at *2 (6th Cir. 1993) (table).").

The district court did not rehear disputed testimony here and this is concerning. "[C]ourts must always be sensitive to the problems of making credibility determinations on the cold record." <u>See</u> <u>United States v. Raddatz</u>, 447 U.S. 667, 679 (1980). Indeed, the Supreme Court has "assume[d] it is unlikely that a district judge would *reject* a magistrate [judge]'s proposed findings on credibility when those findings are dispositive and substitute the judge's own appraisal" because "do[ing] so without seeing and hearing the witness or witnesses whose credibility is in question could well *give rise to serious questions*." <u>Id.</u> at 681 n.7 (second emphasis added). Although it is not necessary to resolve this issue in this case considering the clearly erroneous factual findings, it is worth considering in an appropriate case.

In sum, there was simply no probable cause or reasonable suspicion to initiate the traffic stop. As such, the seizure of Moua was unlawful under the Fourth Amendment, and her motion to suppress evidence obtained during the unlawful stop should be granted. I respectfully dissent.

_____